## DELAWARE & H. CO. v. LARNARD.

(Circuit Court of Appeals, Third Circuit. May 5, 1908.)

No. 17.

1. RAILROADS—ACCIDENTS AT CROSSINGS—EFFECT OF OPEN GATES.

The fact that safety gates maintained by a railroad company at a highway crossing are open is an implied invitation to persons traveling the highway to enter upon the crossing; ·and, while it does not absolve them from the duty of taking reasonable precautions to· avoid injury by moving trains, it qualifies that duty to the extent that they may reasonably presume that the company's servants have performed their duty in ascertaining the safety of the crossing.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Railroads, § 1072.]

2. SAME—NEGLIGENCE—ABSENCE OF FLAGMAN AT DANGEROUS CROSSING.

The four tracks of defendant railroad company and those of two other companies crossed a street near each other. There were yards near, and the tracks were largely used for switching purposes. Defendant maintained gates at the outer sides of the entire group of tracks; they being 224 feet apart. Plaintiff's husband and his son approached the crossing on foot, with two wagons following, loaded with lumber, which was to be loaded in a car. The gates were open, and deceased and his son went ahead as a further precaution against trains which might be approaching. When they reached the center of defendant's tracks, they saw a train approaching on one of the inner tracks and started back, when a freight train on the outer track backed, and plaintiff's husband was struck and killed by the caboose, which was being kicked back onto a switch. The son testified that the car was standing still and was started suddenly. The conductor testified that it was moving slowly, and that he stood on the rear platform of the caboose and called a warning to the deceased. *Held*, that under such evidence the jury were justified in finding that the crossing was an unusually dangerous one, and required extraordinary care on the part of defendant, and that, in view of the open gates, the failure to station a man at the crossing, either permanently or temporarily, to give warning of the movement of the switching train, was negligent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Railroads, §§ 972–977, 1072.

Duty to give warning signals at crossing, see note to Chesapeake & O. Ry. Co. v. Steele, 29 C. C. A. 90.]

3. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

The question of contributory negligence is for the jury, unless the evidence to establish such negligence is clear and uncontradicted, and such that no reasonable man could come to a contrary conclusion.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Negligence, §§ 279–302.]

4. RAILROADS—ACTION FOR INJURY TO PERSON AT CROSSING—INSTRUCTIONS.

In an action to recover for the death of a person killed at a railroad crossing by a switching train, a statement in the charge of the court that, if a member of the crew had been stationed at the crossing to warn persons on the highway of the movements of the train, it might have prevented the injury, was not reversible error, in connection with clear instructions as to the province of the jury and giving the claims of the

respective parties, and where the evidence was such as to warrant a finding that the failure to so station a man was negligence.

In Error to the Circuit Court of the United States for the Middle District of Pennsylvania.

James H. Torrey, for plaintiff in error.
Paul Sherwood, for defendant in error.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

GRAY, Circuit Judge. The material facts disclosed by the record brought before us by the writ of error in this case are as follows:

The defendant in error (hereinafter called the plaintiff) brought her action in the court below against the plaintiff in error (hereinafter called the defendant) to recover damages for the death of her husband, who was killed while walking on the highway across the tracks of the defendant company, near the Dickson City station, in November, 1906. The highway in question was called Boulevard avenue, and ran nearly north and south where it crossed the tracks of the defendant company, and that of two other railroad companies in close proximity thereto. From a northerly direction, it first crossed, at right angles, the Delaware, Lackawanna & Western Railroad, which, at that point, ran due east and west. It then continued through an open space of nearly 99 feet, to the tracks of the Ontario & Western Railroad, where there were two tracks, and a switch at the crossing branching out towards the west into a number of yard tracks, and a depot building on the northern side of said tracks and on the easterly side of said avenue, not more than 20 or 30 feet therefrom. These tracks, as well as those of the defendant company, crossed the avenue, not at right angles, as those of the Delaware, Lackawanna & Western did, but somehow diagonally, nearly (though not quite) in a northeasterly and southwesterly direction.

After crossing the tracks of the Ontario & Western, the avenue crosses an open space of nearly 58 feet, between the latter tracks and those of the defendant company. These tracks are four in number, the north and south, or the two outside ones, being freight tracks, and those in between passenger tracks. These four occupy a space of 51 feet across. It was at the crossing of the northerly track that the accident in question happened. In the space last mentioned, between the Ontario & Western tracks and those of the Delaware & Hudson, about 20 or 30 feet easterly from the avenue, stood a gatehouse, high enough for the gatekeeper to look over the tops of cars on the several railroads. It appears from the evidence that a gatekeeper was employed by the defendant company, to operate two safety gates which stood to the north of the Delaware, Lackawanna & Western and south of the Delaware & Hudson railroad. There were thus only two gates, one to the north and one to the south of this group of railroads, the distance between the two being about 224 feet.

On the day in question, the plaintiff's husband, with his son, a man about 24 years of age, were coming south on the Boulevard avenue, accompanying two wagons loaded with lumber, owned by the deceased, who was in the lumber business. The wagons were on their

way to the south side of the defendant company's railroad, to load the lumber onto cars standing on a switch of the defendant company on the said south side, a little to the east of the avenue. As the teams approached the tracks of the Delaware, Lackawanna & Western Railroad, the gates were up, but the deceased and his son, as a matter of greater precaution, as testified by the son, walked across these tracks, and the head team followed them, into the open space between these tracks and those of the next railroad. According to the testimony of the son, the team was halted in this space while he and his father walked on across the tracks of the Ontario & Western, and onto and across the northern track of the defendant company. He says, as they were stepping from this track, they saw a passenger train coming from the west on the next track but one of defendant's road, and started back onto the freight tracks from which they had just stepped, when a train of cars, which they had observed upon their left hand and close to the crossing, started with a jerk towards them, striking his father with fatal result, he himself just escaping. There is some testimony to corroborate this of the son, especially as to the sudden movement or jerk of the freight train that was being backed across the highway.

The testimony of the defendant is that a draft of 19 freight cars, with a caboose attached at the rear, had, a short time before, been drawn east of the crossing, in order to back onto certain switches, both east and west of said crossing. That, in coming back, and within a few feet of the crossing, while proceeding slowly, the caboose was uncoupled from the train, in order that it might be shoved back and across a switch west of the crossing, before the rear of the freight train reached it. To accomplish this manœuver, or "kick-back" as it is sometimes called, it was either necessary, if the train were moving at sufficient speed, to stop or slow up, so as to allow the caboose to get away from it, or, if the train was not going fast enough at the time of the uncoupling, to give a shove or start for a little distance, so that the caboose might have the requisite momentum to carry it past the switch ahead of the train. It does not appear with entire certainty how, according to defendant's testimony, the manœuver was accomplished. The plaintiff's testimony, however, seems positive that the train was standing just east of the siding, and started back with a sudden jerk when four or five feet away from the deceased. The plaintiff's counsel has argued that the latter may have been what really occurred, and the sudden acceleration of speed just at the crossing, was equivalent in its results, and might have been mistaken by plaintiff's witnesses for a sudden start from a state of rest. The plaintiff's witnesses, however, were positive that the train was standing still within a few feet of the crossing, and started back with a sudden jerk, which caused it to strike the deceased.

We are not prepared to say that there was no evidence sufficient to support one or the other of these theories propounded by the plaintiff, whatever may be our view as to the weight of the testimony in contradiction of them. Defendant's testimony established the fact that the train was adequately manned with a conductor and brakeman. These all testify that the train, when it started back, continued to move

at a slow rate of speed, uniformly and without acceleration, until the time of the accident, and this testimony is corroborated by that of two engineers or employés on engines standing on the tracks of the other roads alongside of the defendant's. The conductor also testifies that he was at the rear end of the caboose, as it approached the crossing, and saw the deceased standing on the track, and shouted at him twice before the collision, though the son testified that he heard no such warning or other signal. There was also the usual conflict of testimony between those on the train and some who were standing by, as to the hearing of any signal by a bell or whistle, and little importance is to be attached to the testimony of those who can merely say that they did not hear what others positively say they did hear.

There were other facts, however, of a pregnant character, which properly entered into the consideration of the case by the jury, such as, that when deceased and his son and the first team approached the railroads, the safety gate was open, and there was thus presented what the law and common sense concur in designating an "invitation" by those in charge of the railroads, to the deceased and his teams, to enter upon the crossing. While such invitation did not absolve those entering upon the railroad enclosure from the duty of taking reasonable precautions to be watchful as to possible danger from moving trains, it certainly qualifies that duty to the extent that there might be a justifiable presumption by the user of the highway, that the railroad's servants had performed their duty in ascertaining the safety of the crossing. There is the further testimony of the son, that the deceased and himself had gone ahead of the timber wagons, notwithstanding the open gate, for the very purpose of assuring themselves as to the safety of the crossing, and that they stopped, looked and listened before crossing any of the tracks. There is also the evidence tending to show that this crossing occupied by this group of important railroads, upon which there was a heavy freight and passenger traffic and a constant movement backwards and forwards of the engines and cars of three different railroads, was a more than usually dangerous one. If this were so, there was in consequence imposed upon the companies, so far as they controlled it, as well as upon the user of the highway, a duty of care proportionate to these circumstances of danger.

Nor can we say that the jury would be unwarranted in coming to the conclusion, upon all the evidence, that, by reason of the implied invitation of an open safety gate, the defendant company owed a duty of greater care to those who were on its tracks, than was performed by such warning as could be given by the person stationed at the rear of a backing freight train. As we have said, three important railroads were transacting, not only the usual business of running regular freight and passenger trains across this highway, but, there was also a constant movement of engines and cars on all of them, backwards and forwards across it, incident to the shifting in connection with stations and freight yards.

It was with reference to an admitted situation of this character, and the contention by plaintiff's counsel, that the reasonable care required of the defendant company, under the circumstances, demanded

some other precaution than was actually taken to preserve those who were legally using this crossing, from the dangers arising from such a situation, that the court below used the language to which exception is taken in the first specification of error. As this specification presents what seems to us the most serious question in the case, we quote it in full, as follows: .

"First. The learned court erred in that part of its charge to the jury which is as follows: 'It is contended, again, that the company should give warning, but it is answered in reply, that that also was done, not only by the whistle and the bell, and the continual ringing of the bell, but, as testified by the conductor, by calling out, by standing there on the hind platform of the caboose, and endeavoring to give a warning; that he said he did give, when the train was still 150 feet away, and again called out a second time when it was too late. Now, was this sufficient? One party says "Yes," and the other "No." The matter is for you to consider and settle in your own minds. I can conceive that if there had been a brakeman or a flagman or conductor, standing there, instead of being upon the train, that a warning might have been given that would have been more effective. It is true that all the men of that train were occupied; one man had been dropped off—Lannan—in order to protect the train from the south as it crossed over; another had been dropped at the upper end on the other side of the crossing to protect the train from anything in that direction; the middle brakeman was on the box car next to the caboose not only to cut it off from the rest of the train, but to receive signals, if any were required in order to stop the train, and to pass those signals on to the engineer; and the conductor was on the caboose in a position to give any warning as it approached. Still, if there had been another man, either a flagman permanently established at that crossing, to give warning, or temporarily supplied at the time, as I say, I can conceive that that would have been a safeguard of the place that might have prevented this accident.' "

A careful examination of the testimony convinces us that the jury might warrantably believe that the crossing here in question presented more than the usual dangers. While the evidence shows that the train that backed over the crossing was equipped with a sufficient crew to properly handle it, it does not appear that any one of them was specially designated for, or specially stationed at, this crossing, for the purpose of warning those who were using the highway, and we may presume that the crew were charged only with those duties which concerned the handling and movement of the train, and were probably necessary for that purpose, without reference to the guarding of crossings. However that may be, it does not seem that any member of the train crew was stationed at this crossing, for the purpose of protecting those who were using it, and it seems to us there was evidence before the jury, from which they might reasonably infer that there was the absence of reasonable care on the part of the defendant company, in not providing a flagman or watchman for that purpose, and that this, taken in connection with the open gate, was such a dereliction of duty as supported the charge of negligence made by the plaintiff.

It was in dealing with this feature of the case, that the learned judge of the court below said:

"I can conceive that, if there had been a brakeman or a flagman or conductor standing there, instead of being upon the train, that a warning might have been given that would have been more effective. * * * Still, if there had been another man there, a flagman permanently established at that

crossing to give warning, or temporarily supplied at the time, as I say I can conceive that that would have been a safeguard of the place that might have prevented this accident."

We do not think this portion of the charge, in the connection which we have explained, constituted error. It had relation to the facts of the case and to the situation as disclosed by the testimony. While dissociated from the context the language just quoted may seem to intimate a personal opinion on the part of the trial judge, it is in reality only a suggestion of what might be believed in plaintiff's view of the testimony. It is immediately preceded, after stating what in substance is the controversy between the parties, by the instruction to the jury, that the matter was for them to consider and settle in their own minds, and is followed immediately and throughout the charge by statements of the other side of the controversy, and clear instructions to the jury as to their province in dealing with the facts of the case, and insistence upon their plenary duty and power to deal with them according to their own judgment.

Considering the charge as a whole, it did not permit the jury to embark upon a sea of speculation, as contended for by the plaintiff, in error, nor permit them to hold that the company was required to place "such number of employés at the crossing, and so stationing them as to make it a physical impossibility for the plaintiff (deceased) to go upon the track in front of the cars." The inference permitted to the jury was that the absence of such a guard or flagman, under the circumstances, was negligence on the part of the company, and that the presence of such a precaution would probably (not necessarily) have prevented the accident, and such an inference was not, in our opinion, upon all the evidence, an unwarranted one. It is not necessary to show that the presence of such a guard or watchman would have prevented the accident, but only that, under the circumstances, it was a precaution which due care required to be made, and that it probably would have prevented the injury complained of. In dealing with the question, what inference upon a given state of facts it is permissible for a jury to draw, no hard and fast rule can be laid down for the guidance of a trial judge. The circumstances of the particular case, as well as the rules of law that may be applicable thereto, must furnish the ratio decidendi in such cases, and thus viewing the action of the court below, we think no right of the defendant has been violated. On the contrary, the charge throughout was as favorable to the defendant, as it had the right to demand.

The second and third assignments of error relate to the refusal of the court to give the jury binding instructions, that upon all the evidence they should find a verdict for the defendant, the contention of the learned counsel for the defendant being that there was no evidence to support the charge of negligence against the defendant, or, assuming that such negligence was shown, it clearly appeared from all the evidence, that the deceased was guilty of contributory negligence. The first branch of this contention, involving the propriety of the submission of the question of defendant's negligence to the jury, has been disposed of by what we have already said.

The general rule is that the question of contributory negligence is one for the jury, and can only be departed from where the evidence to establish such negligence is clear and uncontradicted, and such that no reasonable man could come to a contrary conclusion. The same principles are therefore involved in considering the duty of the court, whether the question relates to the negligence of the defendant, or the contributory negligence of the one suffering the injury.

We think little is required to be said as to this latter branch of defendant's contention. To have withdrawn the case from the jury on the ground that deceased clearly contributed to his own injury by his own negligence, would have been to ignore entirely the testimony of the son of the deceased, of several of the witnesses, and also certain facts and presumptions belonging to the plaintiff's side of the case; such facts, for instance, as the open gate, the presence of engines on the various tracks, with their escaping steam, and the approach of a train on an adjoining track of defendant's road, and the presumption that ordinarily arises, that a reasonable being will take due precautions to guard against manifest danger to life and limb, a presumption reinforced in this case by the uncontroverted fact that the deceased and his son had proceeded through the open gate and were crossing the various tracks of the different railroads, for the very purpose of ascertaining whether the way was clear for the teams they had in charge. With the weight of testimony on either side, the court below had, of course, nothing to do, but, after a careful examination of all the evidence, we are of opinion that it did not err in its refusal to withdraw the case from the jury.

The fourth specification of error regards what the court said as to defendant's point, that the fact of the safety gates being open, had a "tendency at least to give the traveler the impression that all is safe, and thereby blunt the edge of his caution," the language of the court being as follows:

: "That applies a good deal more when a person is driving than when he is walking because, as I have said to you, and as you well know, it is a good deal more difficult in one case to look about you and govern your action, than it is in the other. It is true, however, in both cases, that if a safety gate is there, and the safety gate is up, the natural tendency of it is to throw one off ordinary precaution; and you may take that into consideration, if the facts are such as suggested in this point, in disposing of the questions which are involved here."

It may be gathered from what we have already said, that, in our opinion, this is a correct statement of the law. The suggestion made by the learned trial judge, that a greater responsibility rests upon one who walks across the railroad track, where the gate is open, than upon one who drives across, was altogether in favor of the defendant. We find, therefore, no error in the judge's charge in this respect, and the fourth assignment is without merit.

The fifth assignment of error relates to certain portions of the court's charge regarding the measure of damage. No argument has been presented in plaintiff's brief, in regard to this assignment, but this court has carefully considered that portion of the charge covered by it, and finds no error therein.

It only remains to say that the charge, which was an elaborate one, fairly summarized the evidence on both sides for the benefit of the jury, and correctly stated the principles of law that should govern its deliberations. It was eminently fair to the defendant.

The judgment below is hereby affirmed.