AARON B. LOCKRIDGE, Plaintiff and Appellee, v. MINNEAPOLIS & ST. LOUIS RAILWAY CO., Defendant and Appellant.

**Verdict:** CONCLUSIVENESS UPON APPEAL. Where there is more than a scintilla of evidence to support the verdict of a jury their judgment upon the facts is final, in the absence of any showing of passion or prejudice.

**Railroads:** CROSSING ACCIDENT: NEGLIGENCE: EVIDENCE. In this action for injuries caused by the collision of plaintiff's automobile with a railway train at a street crossing, the evidence is reviewed and held sufficient to support a finding that the flagman negligently failed to warn plaintiff of the approaching train; that the train-

men failed to give warning of its approach; and that plaintiff was free from contributory negligence.

**Same:** NEGATIVE AND POSITIVE EVIDENCE: WEIGHT.    While ordinarily the positive testimony of a witness that he saw an object or heard a sound is more persuasive than the negative evidence of one who testifies to the nonexistence of such facts; still, the probative force of such negative evidence depends largely upon the circumstances and situation of the parties.    Thus where plaintiff, who frequently passed over a railway crossing with his automobile and was familiar with the duties and signals of the flagman and those operating trains at the crossing, testified that he looked and listened for approaching trains and saw no flagman and heard no crossing signals, his evidence though negative in character was of probative force.

**Same:** CONTRIBUTORY NEGLIGENCE.    Failure of one when about to cross the tracks of a railway to stop, look and listen for approaching trains is not a hard and fast rule; and is not under all circumstances such contributory negligence as will defeat recovery for an injury caused by collision with a passing train.

**Same.**    Where a railway company maintains a flagman at street crossings in a populous city, as required by the ordinances of the city, travelers may assume that when no warning signal is given they may cross the tracks in safety.

**Same:** VIOLATION OF STATUTE: EFFECT.    Before the violation of a statute will preclude recovery for an injury some causal relation between the unlawful act and the resulting injury must be shown.    Thus the operation of an unregistered automobile in violation of the statute will not defeat recovery for an injury received at a railway crossing.

*Appeal from Polk District Court.*—HON. LAWRENCE DE GRAFF, Judge.

FRIDAY, APRIL 11, 1913.

ACTION to recover damages resulting from a collision between an automobile and a railway train at a public crossing.—*Affirmed.*

*George W. Seevers* and *W. H. Bremner,* and *E. D. Samson,* for appellant.

*W. S. Ayres,* for appellee.

GAYNOR, J.—This action is brought to recover damages from the defendant claimed to have resulted from a collision occurring between a train, operated by defendant, and an automobile driven by the plaintiff, at a point where the defendant's tracks cross West Ninth street in the city of Des Moines. It appears that on the 15th day of April, 1911, the plaintiff was proceeding south on Ninth street in an automobile, and that while crossing the track of defendant, where it intersects Ninth street, his automobile was struck and destroyed by a train operated by the defendant. It appears that West Ninth street runs north and south; that the defendant's tracks at the point of the collision run east and west across Ninth street. For the purpose of this case, we will say there are four tracks, counting from the north, over which the defendant was required to pass in order to avoid an accident at the point where the collision took place. It appears that it is twelve feet and three inches from the north rail of track No. 1 to the north rail of track No. 2 immediately south. That at the time of the collision, there was a string of box cars on track No. 1 on the west side of Ninth street, and flush with the curbing. That on track No. 2, immediately south, there was a string of gondola cars, a few feet west from the curbing, and they were loaded with coal. That immediately south of track No. 2, there is a track known as the "repair track," which extends from the east, within about six and one-half feet of the curbing on the west. That it is twelve feet one and one-half inches from the north rail of track No. 2 to the north rail of this repair track. That immediately south of this repair track is what is known as the "main line," and it was on this track that the train was being operated at the time of the collision. Immediately west of the west end of the repair track is a shanty six and one-half feet north and south and four feet two inches east and west, and eight feet six inches from the west end of the repair track, and eighteen inches west of the west curb line of the street. That this shanty is eight feet four inches south of the

south rail of track No. 2 and six feet eight inches north of the north rail of the main line on which the collision occurred. It also appears that it is thirty-eight feet two inches from the north rail of track No. 1 to the north rail of the main track. That it is twenty-one feet two inches from the south rail of track No. 2 to the north rail of the track known as the main line on which the accident occurred.

It appears that at the time plaintiff approached the north track and until he reached the shanty, hereinbefore referred to, he was traveling at the rate of five miles an hour. At least, there is evidence from which the jury might have so found, and it appears that, traveling at the rate of five miles an hour, it would have taken the plaintiff approximately five seconds to reach the south line of the shanty where he would have clear view of the main line to the west. It appears that at that rate of speed it would have taken the plaintiff about one second to pass from the south rail of track No. 2 to a point immediately east of the shanty; probably a second and a quarter. It appears that the plaintiff was sitting on the west side of the automobile, driving, and on the side left of him sat his son. On the side immediately back of him sat a Mrs. Shera, and on the left of Mrs. Shera was sitting the plaintiff's wife. There is evidence that while the plaintiff was crossing the track No. 2, or immediately after he had crossed, his wife notified him that there was a train coming. It does not appear that she notified him on what track the train was moving. It is claimed that she saw the moving train between the trucks of the cars standing on tracks Nos. 1 and 2. This seems improbable, if not entirely impossible, from her elevated position. If she saw the cars at any time while on track No. 2, it must have been after they had passed the obstructions on track No. 2, and a view obtained by her through the space existing between the shanty and the gondola cars on track No. 2. It is apparent that, sitting in the rear of the automobile, any view obtained by her must have been after the automobile had come from behind the obstructions,

and the front end of the automobile would then have been within fifteen or eighteen feet of the north rail of the main line.

Defendant's train that collided with the automobile was loaded with sand. The engine was attached to the west end of the train. The train was backing. It started from a point about two hundred and fifty feet west of the west line of Ninth street. It was backing at about the rate of four or five miles an hour. It appears that the defendant's track west of Ninth street, and to Eleventh street, curves somewhat to the north. It does not appear that there was anything to obstruct plaintiff's view to the east while crossing these tracks. It appears that the plaintiff, when proceeding southward on Ninth street, and prior to the collision, was traveling on the west side of the street. It appears that the plaintiff was accustomed to running automobiles, and that this automobile was in good order and the brakes working well. It appears that the plaintiff had frequently passed over this crossing before in going to, and returning from, the city, and knew that there was a good deal of switching done at this point. It appears also that the car was muffled and was making very little noise. There is evidence that the train moved about seventy-five feet after it struck plaintiff's automobile.

The plaintiff claims that the defendant was negligent in this: (1) That defendant had no gates erected and in operation at this crossing. (2) That though it kept a flagman at the crossing, the flagman failed and neglected to warn the plaintiff of the approach of this train. (3) Defendant failed and neglected to ring its bell or give other warning. (4) That defendant failed and neglected to have any lookout upon the rear of the train as it approached this crossing. (5) The plaintiff claims that there are five tracks across Ninth street at that crossing; that upon the north track the defendant had placed a long string of cars which extended into the street; that on the second track, immediately south, there was a string of cars close to the street, thereby obstructing the view of the

plaintiff to the west; that the injury to the plaintiff was the proximate result of the negligence of the defendant complained of, and the plaintiff himself was free from any negligence, on his part, contributing to the injury of which he complains. All the charges of negligence made by the plaintiff were denied by the defendant in its answer. There are other matters tendered in the answer; but, under the view we take of the case, they were not defensive in their character. Upon the issues thus tendered, the cause was tried to a jury and a verdict rendered for the plaintiff. That a motion for a new trial was filed by the defendant and overruled, and judgment entered by the court on the verdict. From the action of the court in overruling the motion for a new trial and entering judgment upon the verdict, this cause is brought to this court for review.

The defendant assigns and argues several errors alleged to have been committed by the court, which may be grouped as follows: (1) That the evidence shows such conduct on the part of the plaintiff, contributing to the injury of which he complains, that the court should, at the conclusion of the evidence, as a matter of law, have found and determined that the plaintiff was guilty of such negligence as precluded recovery on his part, and should therefore have instructed the jury to return a verdict for the defendant, for that reason. (2) That the verdict is against the evidence and contrary to the instruction of the court. (3) That no negligence of the defendant contributing to the injuries complained of was shown, and for this reason the verdict should have been directed by the jury.

The determination of the question raised by these assignments of errors, so presented and argued, necessitates an examination of the record to ascertain whether or not they existed.

I. At the outset it must be borne in mind that, if there is more than a scintilla of evidence to sustain the action of the

court and the verdict of the jury, this court will not interfere.
It is not the province of this court to weigh the evidence, or to sit in judgment upon the credibility of the witnesses. Where there is a clear conflict in the evidence as to the existence of any fact material to the proper determination of the case, this court will not invade the province of the jury, reconsider, and weigh the evidence bearing upon the question in controversy. The jury are the triers of the fact. They are the sole judges of the weight of the evidence and the credibility of the witnesses, and in the absence of any showing of passion or prejudice, their judgment upon the facts is final in all cases where there is evidence in the record supporting their finding. This has been so often said that it is almost academic.

1. VERDICT: conclusiveness upon appeal.

We proceed now to an examination of the record, for the purpose of determining whether or not there is evidence in the record upon which the verdict of the jury is supported.

We will first consider the evidence bearing upon the first ground of complaint made by the plaintiff in his petition, to wit, that there were no gates erected and in operation at this intersection. This is conceded.

II. That although the defendant kept a flagman at said intersection, said flagman failed and neglected to warn the plaintiff of the approach of the train.

The plaintiff testifies:

As I approached these tracks over which I was required to pass on my journey, I looked and listened. I heard no train at all. Received no warning. There was no flagman at the crossing. As I approached the tracks of defendant's railroad, I looked to the east. I then looked to the west. I saw no flagman. I supposed the track was clear. I had, prior to this time, seen a flagman at this intersection. When my wife spoke to me, I tried to stop the machine. I was struck on the main track. There was no noise to speak of from the machine. I could see no smoke. Could not see anything on account of those cars which were backed up to the curb on both these tracks.

2. RAILROADS: crossing accident: negligence: evidence.

Hazelwood, a witness for the plaintiff, testifies:

I watched him as he went up to the track. When he got just about to the first track, I should judge, the flagman came out and tried to flag him. He tried to stop. I could see that plainly. Just then the train came in view, backing up.

He was asked this question:

Where was the train when the flagman came out? It must have been right there, because he jumped out right there. I should judge the train was right behind the shanty. Had not seen or heard the train before that. As he got right there, this flagman jumped right in front of the machine and tried to push it back. I don't see how he got there in front of the machine, because the engine was right there. The flagman did not have any flag in his hand. He came out just as the car was coming on the north track. I could not swear that he got across the first track when he tried to stop the machine. I don't know that he got to the second track when he tried to stop the machine. He tried to stop it right away. He tried to stop it at once when the flagman tried to stop him. He tried to stop, as far as I could see, right as the flagman came there, as the flagman jumped out in front of him. That was the instant the flagman signaled him to stop, so far as I could see.

Plaintiff further testifies that when his wife spoke to him and said, "There comes a train," his car could not then have been over fifteen feet from the track where the train came down.

Probably the back end of my car had reached the south rail of track No. 2. I could not say as to that. It was right there somewhere. I looked both ways. Saw everything clear and no flagman. When I passed over track No. 2, I looked through between these coal cars on track No. 2 and the flagman's shanty. I don't remember of seeing any moving train at all. I didn't see the sand cars until they struck the automobile. As soon as my wife spoke to me, I tried to stop the

automobile. I threw on the brake. I understood the train was coming from the west. I was not able to get it stopped until I was on the main track. The front end of my automobile was four or five feet from where I sat.

Hazelwood further testifies:

An instant after I saw the flagman, the train and the automobile came together. It all came so quick I could not move.

Mrs. Shera testified:

I was sitting in the car just behind the plaintiff. At the time Mrs. Lockridge told her husband a train was coming. Mr. Lockridge immediately reached down to stop the car. I looked for a flagman, but did not see one. I didn't see any one on the first flat car as it approached. I was looking before we came to the track and when we were on the second track. As near as I can remember, I looked west and saw an engine, and what I supposed to be a box car.

Mrs. Lockridge testified:

I was listening while we were crossing these tracks, and as I looked west, I saw the moving wheels under a car, and I said, here comes a train. He tried to stop. Put on the brakes. Slowed down the car. We were moving, and the train was moving. It seemed to me just like an instant until we were hit. I think perhaps we were twelve or fourteen feet from the track the train was on when I spoke about seeing it. I was looking for the flagman all the time, but did not see one. I did not see any one on the cars.

As to the third act of negligence claimed by plaintiff, to wit, that the defendant failed and neglected to give warning by ringing a bell or any other signal as it approached this intersection, we find the following:

Hazelwood testified, when asked this question:

Q. When you saw the flagman, where was the train as to the flagman's house? A. I should judge it was right behind it. Of course, I could not see. I judged from the time it got there. Q. Had you heard or seen the train before that?

A. No, sir; I did not know it was on earth.  Q. What occurred then?  A. He (the plaintiff) was right there, and defendant's flagman jumped out and tried to stop him and waved his hand up and down.  As he got there, the flagman jumped right in front of the machine and tried to push it back.

Mrs. Strauss testified on this point:

I was in a buggy.  I was about a half a block north of the tracks.  Of course, I always look out for cars and trains. I saw this automobile ahead of me.  I saw the train, but I did not say anything.  I thought the one in the automobile surely knew how close he was to the train; that he could see better than I could.  The automobile was going and the train was going.  I didn't see any flagman there.  I don't remember that I heard the train or bell.

Mrs. Lockridge testified on this point:

I was listening and I looked.  I did not see or hear the train as we were nearing the track.  When I did see the train, I told my husband the train was coming.  He then tried to stop the car, and in an instant we were hit by the train.

On the fourth proposition there is evidence that the parties looked and failed to see any one on the rear end of the train.

The fifth proposition, that there were cars on tracks Nos. 1 and 2, is not in dispute.

From this evidence, the jury might have well found, although it is negative testimony, that no flagman appeared to give plaintiff warning of the approach of this train, until it was too late for him to stop and avoid the collision.  They might have found that no bell was rung and that no one was on the rear end of the train to give warning of its approach; that plaintiff's view in approaching this track on which the train was operating was cut off by the act of the defendant in placing the cars on tracks Nos. 1 and 2, and the shanty within eighteen inches of the curbing on the west side of the street;

and that the defendant was therefore negligent, and the plaintiff free from negligence. This evidence, however, is disputed by the defendant; defendant's witnesses testifying that a flagman was there, that he gave plaintiff sufficient warning to enable him to stop, that he neglected to heed the warning, that the bell was rung continuously, that there was a man on the rear end of defendant's train to give warning to parties approaching, and that he did give warning to the plaintiff of its approach.

It is true that the plaintiff's testimony as to the ringing of the bell and the presence of the flagman at the point where the collision occurred is negative in its character, and it is

3. SAME: negative and positive evidence: weight.

true that, under ordinary circumstances, negative testimony has not the probative force that positive testimony has as to the existence or nonexistence of the matters in controversy. It is true that the testimony of one equally credible, that he looked and saw an object, is more persuasive to the mind than the testimony of one who says he looked and did not see the object. Under ordinary circumstances, the testimony of a witness, who was in a position to hear, that he did hear the bell rung, is more reliable as a basis for forming a judgment than the testimony of one, in the same position, who simply testifies that he did not hear the bell rung at the time in question. The probative force of this negative testimony depends largely upon circumstances. Where it appears, from the testimony, that the party was in fact looking and listening, that it was his duty to look and listen, and as in this case, where a failure to exercise his faculties in respect to these matters, not only imperiled his property, but his own safety and the safety of his family, then, when he said he looked and listened and did not see and did not hear, it reaches the mind with most persuasive force. It appears here that the plaintiff had frequently passed over this crossing; that at other times a flagman was there, whose duty it was to give, and who, in the performance of his duty, gave, signals of warning to travelers

upon the highway. It appears that plaintiff looked and found no flagman at this point, on this day, and heard no bell rung to warn him of the approach of the train. The jury might well have found, from the record, that the flagman was there, but that he did not appear to give warning to the plaintiff, until it was too late to avoid a collision; that he ran from whatever point he occupied, as plaintiff was approaching, to the plaintiff, ran in front of plaintiff's car and tried to stop it. The jury might well have found that he was not attending to his duties strictly at this time, for the evidence shows, or tends to show, that he ran in great haste to the plaintiff, gesticulating wildly with his hands; that his haste in coming was such that he neglected to bring the flag with him, that was used as a warning; and that he only came when he saw the plaintiff in such a position that there was immediate peril to the plaintiff unless he could be stopped at once.

The rule that one must stop, look and listen before crossing a railway track is not a hard and fast rule, 4. SAME: contributory negligence. in this state, and the failure to observe the rule is not in itself, under all circumstances, such contributory negligence as defeats recovery.

This court, in *Hartman v. Railroad Company,* 132 Iowa, 584, said: "It is easy to say, and it is a correct proposition, that a person approaching a railway crossing must bear in mind that it is a place of danger and he must be vigilant to discover the approach of trains, and use reasonable care to avoid injury therefrom. But whether such reasonable care requires him to stop, look, and listen, whether he had a right to place reliance upon the absence of danger signals or upon any other given fact or circumstance, depends so much upon the peculiar conditions by which he is surrounded that, save in cases exceptionally free from doubt, the question of contributory negligence must be left to the jury, and an instruction that the failure to stop, look, and listen at all points in his passage over railway crossings is contributory negligence, is erroneous."

In the case of *Schulte v. C., M. & St. P. Ry. Co.*, 114 Iowa, 94, this court said: "The traveler is held to the duty of looking and listening for approaching trains, within a reasonable distance from a crossing, and if this has been done, it is for the jury to say whether he was bound, in the exercise of ordinary care, to stop, look, and listen, or to look and listen without stopping at some other point nearer or farther."

In support of these propositions, see *Selensky v. C. G. W. Ry. Co.*, 120 Iowa, 115; *Moore v. C., St. P. & K. C. Ry.*, 102 Iowa, 595; *Lorenz v. B. C. R. & N. Ry.*, 115 Iowa, 377; *Mackerall v. O. & St. L. Ry. Co.*, 111 Iowa, 549; *Willfong v. O. & St. L. Ry. Co.*, 116 Iowa, 548; *D. & H. R. Co. v. Larnard*, 161 Fed. 520 (88 C. C. A. 462).

Moreover, it is a rule of common sense as well as law that in a populous city, where, under the ordinances of the city, a railroad company is required to have gates or maintain watchmen or flagmen, and where they are maintained by a railroad company, parties have a right to presume that, when no warning is given to them as they approach, they may proceed with safety. In support of this, see *Evansville, T. & H. R. Co. v. Berndt*, 172 Ind. 697 (88 N. E. 614); *Safety Trust Co. v. Wabash Ry. Co.* (C. C.) 27 Fed. 159. In the Evansville Case, above cited, the court advised the jury, in one of its instructions: "If it was the custom of the railroad company to close its gates when an engine or a train of cars approached, and the person injured was familiar with that custom, and when he approached he found the gates open, and no warning was given that it was unsafe to cross, he had a right to presume that no locomotive or train was approaching and that it was safe to cross the railway tracks." The Supreme Court of Indiana said: "This instruction involves a declaration of law approved by this court. The court says the third instruction given the jury was substantially the same, with the additional statement that the open gates were an affirmative assurance that there was no danger and was a circumstance upon which the

5. SAME.

traveler, exercising ordinary care, might act without being chargeable with negligence.'' This seems to us to announce a correct and reasonable rule, and it cannot be said that a man of ordinary prudence, having regard to his own safety, would not act upon such assurance.

It is next urged by the defendant that the plaintiff was a trespasser upon the streets of Des Moines and upon the crossing in question, for that he was traveling in an unregistered automobile; and the defendant owed him no duty, as such trespasser, except to refrain from wantonly injuring him when he was seen to be in peril, and, as there is no evidence of any such misconduct on the part of the defendant, verdict should have been directed for the defendant, and many authorities are cited in support of this proposition, and many authorities support the proposition; but whatever the law may be in other jurisdictions, this court is committed to the doctrine that there must be some causal connection between the act involved in the violation of a statute, and the injury resulting, before the violation of the statute will preclude recovery. The mere fact that the party, at the time of the injury complained of, was doing an illegal act, will not defeat his recovery, unless the illegal act charged has some causal connection with, and is in some way a concurrent cause of, the accident. This doctrine has been so fully considered in the case of *Tackett v. Taylor County*, 123 Iowa, 149, that nothing can be added to what is there said on this question. That was a much stronger case in the application of the doctrine contended for by the defendant than is the case at bar; but we think it decisive of the question here under consideration, and we hold, therefore, the court did not err in instructing the jury that the fact that the plaintiff was driving an unregistered automobile did not preclude recovery in this case.

6. SAME: violation of statute: effect.

Complaint is made of the refusal of the court to give certain instructions asked by the defendant, and of the action of the court in giving certain instructions on its own motion.

As to the instructions asked by the defendant, the rule therein laid down is fully covered by the instructions given by the court.

. As to the instructions given by the court, we find they announce correct rules of law and that no errors can be predicated thereon.

Upon the whole record, we find no grounds for reversal, and the cause is therefore *Affirmed.*