Robert Applegate et al., Special Administrators, Appellees, v. Chicago and North Western Railway Company, Appellant.

Gen. No. 10,173.

142

144

Opinion filed March 9, 1948.
Rehearing denied May 4, 1948. Released for publication May 5, 1948.

DRENNAN J. SLATER and JAMES B. O'SHAUGHNESSY, both of Chicago, for appellant.

DAVID L. PHILLIPS and BOYLES & FISHER, all of Waukegan, for appellees; HENRY D. FISHER, of Waukegan, of counsel.

MR. JUSTICE BRISTOW delivered the opinion of the court.

This is an appeal by the defendant Chicago & North Western Railway Co., a corporation, from a judgment of the circuit court of Lake county in favor of plaintiffs in a proceeding for damages for the death of

plaintiffs' intestates who were killed in a collision between the car in which they were riding and one of defendant's trains.

The primary inquiry presented by this appeal is whether the circuit court erred in denying defendant's motions for a directed verdict, for judgment notwithstanding the verdict, and for a new trial, and in submitting to the jury the issues of whether defendant was negligent, and whether decedents exercised due care for their own safety.

From the evidence adduced before the trial court it appears that on October 1, 1945, about 3:30 p. m. plaintiffs' decedents, Everett Applegate, Mable Scott, and Maxine Scott, were riding in an automobile apparently driven by the owner, Everett Applegate, in a westerly direction on 27th street in the town of Zion, Illinois, which has a population of some 9,000. The street runs east and west, and crosses at right angles the defendant's tracks, which run north and south, and are located four blocks east of the business section of the town.

At this crossing, which is over 51 feet long, there are four sets of tracks. The two easterly sets are main line tracks, and the two westerly sets are switching or passing tracks, and they will be referred to hereinafter as tracks 1, 2, 3, and 4, proceeding from east to west. In the northeast quadrant of this intersection, some 25 feet east of the tracks, there is a flasher light signal consisting of four light units, two facing east and two west, mounted on a post on top of which is a warning bell. There is an identical apparatus in the southwest quadrant with the exception of the bell, and on each of these two posts there are cross buck signs reading "RAILROAD CROSSING." Approximately 2,000 crossings were made daily over this intersection, according to the testimony of the chief of police of Zion.

The collision and the events immediately prior thereto were described by the eyewitnesses Louise

Carroll and her mother, Catherine Carroll, who both testified on behalf of the plaintiffs. These witnesses were in a car driven by Louise Carroll, and parked a few feet west of the southwest light signal, which was flashing to warn of the freight train that was passing in a southerly direction over main track number 1 at approximately 30 miles per hour.

Louise Carroll testified that the instant the caboose cleared the edge of the pavement on 27th street, the northeast light signal on the opposite side of the tracks stopped flashing, and she started her car forward toward the tracks. As she did so, she saw the decedents' car, which had been parked even with this northeast light signal, start moving slowly toward the crossing at the same moment that she did. When her car reached the first set of passing tracks, a distance of some 25 feet, she saw the northeast light signal commence flashing again, and she stopped instantly. Then she saw a "yellow flash," defendant's train No. 401, proceeding toward the intersection from the south on track 2 at approximately 90 miles per hour. She screamed, for it was apparent that the streamliner would hit decedents' car which was moving toward track 2, and when the front part of the car was on this main track, it was struck by the "401," and all the occupants of the car were killed.

Catherine Carroll corroborated the fact that the signals failed and testified that the southwest signal adjacent to their car, also stopped flashing, and that when it resumed operation, it was "acting funny," or flashing more rapidly than it had previously. Both Louise and Catherine Carroll stated that they heard no whistle or bell or other warning from the "401." The engineer of that train, however, testified that the bell on the locomotive had been ringing automatically for a distance of some 2,000 feet south of the crossing, and that he sounded a warning blast on the whistle at approximately 600 feet from the crossing. Moreover,

defendant offered the testimony of witnesses who had been in the rear car of a local suburban train waiting on the track 4, some 1,000 feet north of the crossing, for the "401" to pass, to the effect that they heard the whistle and bell of the streamliner.

With reference to the light signals, the conductor and brakeman on defendant's freight train testified that they saw the signals flashing as the caboose passed the intersection, and defendant's signal maintainer explained the operations of this apparatus. According to his testimony, the signals are designed to operate automatically, so that when a train enters the circuit, which indicates an area 3,300 feet north and 3,400 feet south of the crossing, the lights commence flashing alternately and the bell rings continuously until the train has passed beyond the circuit. He further testified that the apparatus had been inspected and found in working order three days prior to the collision, and also some two hours after it occurred, at which time no repairs were found necessary.

On the basis of the foregoing controverted evidence, the circuit court denied defendants' motion for a directed verdict, and submitted the case to the jury. The jury returned verdicts in the amount of $2,500 for plaintiff Robert Applegate, for the death of Everett Applegate, and $2,500 and $6,030 for plaintiff Hugh Scott, for the deaths of Mable and Maxine Scott, respectively. The circuit court thereafter denied defendant's motion for judgment notwithstanding the verdict, and entered judgment on the verdicts. Defendant has appealed from the judgment and from the rulings on its motions.

In determining the propriety of the circuit court's denial of defendant's motions for directed verdict, and for judgment notwithstanding the verdict, this court must ascertain whether plaintiffs established the essential elements of their case, to wit, that defendant was guilty of negligence which proximately caused the

death of the decedents, and that they were in the exercise of due care for their own safety at the time of the collision. (*Illinois Cent. R. Co. v. Oswald,* 338 Ill. 270.)

It is plaintiffs' theory that defendant railroad was negligent in failing to give a proper warning signal of the approach of the "401"; in operating the train at too high a speed over this particular intersection; in failing to provide adequate crossing protection; and finally, plaintiffs contend that all these factors combined constituted negligent conduct for which defendant should be held liable.

Defendant, however, insists that there is no evidence tending to show that it was guilty of negligence, and that on the contrary, the conduct of the driver of the automobile in which plaintiffs' decedents were riding proximately caused the accident.

Under the terms of the Illinois Statutes (ch. 114, par. 59, Ill. Rev. Stats. 1945 [Jones Ill. Stats. Ann. 114.095]) it is required that "every railroad corporation shall cause a bell of at least 30 pounds weight, and a steam whistle placed and kept on each locomotive engine, and shall cause the same to be rung or whistled by the engineer or fireman at a distance of at least 80 rods from the place where the railroad crosses or intersects any public highway, and shall be kept ringing or whistled until such highway is reached." It is a sufficient compliance with this provision if the railroad performs one or the other of these acts. (*Nardoni v. Chicago & E. I. Ry. Co.,* 261 Ill. App. 339.)

In the instant case the engineer testified that the bell rang automatically and continuously from a point approximately 2,000 feet from the crossing, and that he blew a warning blast on the whistle some 600 feet from this intersection. The witnesses, Louise and Catherine Carroll, testified that they did not hear a bell or a whistle, and while negative testimony does not ordinarily raise a question of fact (*Morgan v. New*

*York Cent. R. Co.,* 327 Ill. 339, 343), it does have probative value where it appears that the witness was in such proximity that he could have heard the sound had it been given, and that his attitude of attention was such that if the bell or whistle had sounded it would have attracted his attention. (*Berg v. New York Cent. R. Co.,* 391 Ill. 52, 56.)

██ ██ In the instant case, however, the witnesses were concentrating on the passing freight cars, and the noise therefrom undoubtedly obscured all other sounds, hence it could reasonably be assumed, despite their negative testimony, that the engineer did give •the warning. The whistle however, was not sounded at least 80 rods from the intersection, but since the bell was rung at the prescribed distance, there was a sufficient compliance with the statute, and, therefore, the conduct of the defendant with reference to the signals was not in itself an act constituting negligence.

██ Irrespective of the statutory requirements, defendant had a common-law duty to give timely warning of its approach. (*Continental Improvement Co. v. Stead,* 95 U. S. 161, 24 L. Ed. 403, 405.) Although the bell was rung some 2,000 feet from the crossing, the engineer knew, or should have known, that this sound would be obscured by the noise from the passing freight train, and the whistle which was sounded at 600 feet from the crossing would not be heard until about four seconds before the train crossed the intersection since it was traveling at 90 miles an hour, or approximately 130 feet per second.

██ Under these circumstances, it could reasonably be urged that no effective warning signals were given by defendant's engineer, and where such conduct constituted negligence was properly an issue for the jury to determine.

██ It is frequently held that speed is not negligence *per se* (*Nice v. Illinois Cent. R. Co.,* 303 Ill. App. 292) but, inasmuch as a railroad is always re-

quired to use ordinary care and prudence to guard against injury to persons who may be rightfully traveling on public highways (*Wagner v. Toledo, P. & W. R.*, 352 Ill. 85) speed may under certain circumstances become an act of negligence. (*Humbert v. Lowden*, 385 Ill. 437; *Ballentine v. Illinois Cent. R. Co.*, 157 Ill. App. 295.)

In determining whether the speed of a train is negligence, a court will take into consideration such factors as whether the crossing is within a city or town rather than a rural area, and whether there may be two or more tracks adjoining so that a train on one track may obstruct the view of a second train on another track, and the noise made by one may tend to obscure the warning given by the other, and thereby enhance the hazard. (154 A. L. R. 229, 231, and cases cited; *Leif v. Fleming*, 321 Ill. App. 297 (abst.).)

Inasmuch as the instant case involved a partially obstructed grade crossing, some 51 feet long, on which streamliner trains passed each other and was located within a city and traversed by some 2,000 persons daily, the speed of 90 miles an hour by the defendant's "401" could be deemed negligence, and the issue of whether it was so was properly submitted to the jury.

The only warning of the approach of the "401" provided by defendant other than the aforementioned bell and whistle on the engine was the light signal apparatus. As hereinbefore described, it consisted of two posts, one on the northeast quadrant, and one on the southwest quadrant of the intersection, each of which was mounted with four light units, two facing east, and two west, which were designed, according to defendant's employees, to flash alternately when a train approached within the circuit area of 3,300 feet north and 3,400 feet south of the intersection. On the northeast post there was a bell operating on the same circuit and designed to ring continuously while the train was in the prescribed area.

Eyewitnesses Louise Carroll and Catherine Carroll, who were watching the signals while waiting in their car for the freight train to pass, testified that, although the lights were flashing while the freight train was passing over this intersection, after the caboose crossed the pavement of 27th street, the lights on both signals stopped flashing for several seconds, and when they resumed operation, they were "acting funny," or flashing more rapidly than they had previously. This evidence, however, was controverted by the testimony of the conductor and brakeman on defendant's freight train, who claimed that as the caboose passed the crossing the signals were flashing, and by defendant's signal maintainer who stated that the apparatus had been inspected and found in working order three days prior to the collision, and two hours thereafter.

This conflict in the evidence presented a question of fact upon which the jury was the proper arbiter. However, even if that body were to find that the signals failed, that fact alone would not constitute negligence on the part of defendant under the prevailing rule in this State, for it must appear that defendant had actual or constructive notice of the defect, and no such evidence was submitted in this case. (*Waterbury v. Chicago, M. & St. P. Ry. Co.*, 207 Ill. App. 375, 380.) The failure of the lights is significant in determining whether this type of signal constituted adequate grade crossing protection, however, and in deciding whether plaintiffs' decedents exercised due care for their own safety.

With reference to the adequacy of the protection afforded by the defendant railroad at this crossing, both the Illinois and Federal courts have recognized that, irrespective of statutory requirements, there is a common-law duty devolving upon a railroad to exercise such precautions as will enable travelers to ascertain the approach of a train. (*Wagner v. Toledo, P. & W. R.*, 352 Ill. 85, 90; *Grand Trunk Ry. Co. of Canada v. Ives*, 144 U. S. 408.) The amount

of protection required is dependent upon the circumstances existing at a particular crossing, and a jury will be warranted in finding, even in the absence of any statutory direction, that a railroad company should keep a flagman or gates at a crossing where such crossing is more than ordinarily hazardous.

As stated by the Supreme Court of the United States in the aforementioned *Ives* case, *supra,* an extra hazardous situation is created where it is shown that a crossing "is in a thickly populated portion of a town or city; or that the view of the track is obstructed either by the company itself, or by other objects proper in themselves; or that the crossing is a much traveled one, and the noise of approaching trains is rendered indistinct, and the ordinary signals difficult to be heard by reason of bustle and confusion incident to railway or other business . . ."

It has been held, furthermore, that ordinary prudence might require a particular crossing to be flagged at certain times on account of circumstances of extraordinary danger when that degree of care would not be required at all times, and that is ordinarily a question for the jury. (*Miller v. Atlantic Coastline R. Co.,* 140 S. C. 123, 138 S. E. 675, 687; *Callison v. Charleston & W. C. Ry. Co.,* 106 S. C. 123, 90 S. E. 260, 263; *Chicago, R. I. & G. Ry. Co. v. Zumwalt* (Texas) 239 S. W. 912.)

In the *Zumwalt* case, *supra,* the court stated at page 916: "The standing freight train, together with the obstructions on and near the team track and the roaring of the wind and the dust and dirt blown thereby, all contributed to make it dangerous to pass over said crossing from the south at that particular time. The momentarily expected arrival of the passenger train was necessarily known to the employees of the plaintiff in error, but the traveling public will not be presumed to have known such fact . . . An especially dangerous situation was created by this combination of cir-

cumstances. The duty of plaintiff in error to exercise ordinary care to enable the traveling public to pass over the crossing in safety was measured by the situation. Its duty to meet such situation arose when the special hazard arose and continued while such hazard continued. It reached the crucial point just as the passenger train entered upon the crossing from behind the standing freight train. It was at this critical instant that defendant in error passed from behind the standing caboose onto the main line and a collision was then inevitable.'' ''There was evidence justifying the submission of the issue, and the verdict is not without evidence to support it.''

In the instant case, it would appear that even if the crossing were not deemed ordinarily extra hazardous, exceptional circumstances were created when the ''401'' passed defendant's freight train at this crossing at 90 miles an hour, and it might reasonably be concluded that ordinary prudence would require additional protection at that time.

Notwithstanding this analysis of the specific charges of negligence, the defendant's conduct must be viewed in its entirety and measured by the standards of care promulgated by the courts. It is the considered judgment of this court that the ineffectiveness of the warning blasts from the train, the speed of 90 miles an hour, the failure of the flasher light signals which was the only protection afforded at this crossing, and the extra hazardous nature of this heavily traversed four track intersection, warranted submitting to the jury the issue of whether or not the defendant was guilty of negligence.

Even if there was evidence from which a jury might reasonably conclude that defendant was negligent, it was, nevertheless, incumbent upon plaintiffs to show that such negligence was the proximate cause of the collision, and that decedents exercised due care for their own safety. It is defendant's earnest con-

tention that the conduct of the decedents in proceeding across the tracks while the receding freight train still obscured the view of track Number 2 constituted contributory negligence which was the proximate cause of the accident, and that, therefore, plaintiffs are barred from recovering in this action.

Viewing the evidence and all the legitimate inferences therefrom most favorably for the plaintiffs, it appears from the testimony that immediately after the caboose crossed the pavement of 27th, the light signals ceased flashing, and witness Louise Carroll, as well as the driver of the decedents' car, started moving forward toward the tracks. Louise Carroll testified that after she had reached the first set of passing tracks (track number 4) and was partially on the adjoining track (number 3), a distance of over 25 feet from the southwest signal post, she saw the lights on the northeast signal commence flashing again and she instantly stopped her car. She then caught sight of a "yellow flash" which was defendant's "401" proceeding toward the intersection on track number 2 at about 90 miles an hour. Just as the front part of decedent's car was extending over onto track number 2, it was hit by the streamliner.

The general principles of law with reference to contributory negligence at railroad crossings are that inasmuch as a crossing is an inherently dangerous place, a traveler is bound to exercise care commensurate with the known hazards, (*Price v. Chicago & E. I. Ry. Co.,* 270 Ill. App. 111, 116) and what is required depends upon the circumstances of each case, so that courts are not at liberty to state as a matter of law that one must conduct himself in a particular manner in each case and under all conditions. (*Chicago, B. & Q. R. Co. v. Pollock,* 195 Ill. 156.) Therefore, the issue of contributory negligence does not become a question of law alone, unless the allegedly negligent acts of the plaintiffs are of such a character

that all reasonable men would concur in pronouncing them so. (*Chicago, B. & Q. R. Co. v. Pollock, supra.*)

Where, as in the instant case, warning signals have failed at a railway crossing the Illinois courts as well as those in the majority of jurisdictions have held that the non-functioning of the signals is a factor to be considered by the jury in determining whether there was contributory negligence, since the purpose of the signal is not only to warn traffic of the approach of trains, but its non-operation is to assure the traveler that it is safe to cross. (*Niemi v. Sprague,* 288 Ill. App. 372, 385; 53 A. L. R. 978; 99 A. L. R. 733.) Our Supreme Court in a very recent case, *Langston v. Chicago & N. W. Ry. Co.,* 398 Ill. 248, exhaustively considers the cases in Illinois on this subject. Therein, at page 353, the court had occasion to refer to the case of *Humbert v. Lowden,* 385 Ill. 437, which involved the maintenance of crossing gates and which held: "If the gates were not lowered this amounted to an invitation to travelers on the highway. It was an assurance to them that they could cross over the railroad tracks in safety." The court in the *Langston* case further observed, "It has likewise been held that when railroad crossing signals are maintained by a company, even though the law does not require them to be installed, the public has a right to rely upon the railroad company to keep the same in an efficient working condition."

The failure of the signal, however, does not relieve a traveler from his duty to look and listen for an approaching train, (*Grubb v. Illinois Terminal Co.,* 366 Ill. 330, 337; *Silvey v. Lehigh & N. E. R. Co.,* (C. C. A. 1932) 62 F. (2d) 71, 72; *Lockett v. Grand Truck Western R. Co.,* 272 Mich. 219, 261 N. W. 306) and where the surrounding circumstances at the crossing give to the traveler an unobstructed view of a track, he is not justified in failing to look, or, on looking, failing to see an approaching train. For, regardless of

the failure of the signals, the law does not excuse one from the duty of looking at a railroad crossing unless there is no reasonable opportunity to do so. If the decedents herein had looked in a southerly direction after the caboose passed and the lights suddenly failed, their view would have been temporarily obstructed by the freight train, and they still could not have seen track number 2 on which the "401" was approaching.

Ordinarily where the view is obstructed by a passing train, the majority of courts have held that a traveler is under a duty to wait in a place of safety until the train has passed. (56 A. L. R. 544; *Whiffin v. Union Pac. Ry. Co.*, 60 Idaho 141, 89 P. (2d) 540, 548, and review of authorities cited therein; *George v. Northern Pac. R. Co.*, 59 Mont. 162, 196 Pac. 869, 871; *Lamb v. Pere Marquette Ry. Co.*, 221 Mich. 273, 191 N. W. 227, 229; *Brown v. St. Louis–San Francisco Ry. Co.*, 121 Kan. 32, 245 Pac. 1034). Moreover, it has been held to be negligence, as a matter of law, where the plaintiff proceeded across the tracks while a receding train obstructed her view, and the railroad wig-wag signal was in full operation. *(Whiffin v. Union Pac. Ry. Co., supra.)* Recovery was likewise denied under these circumstances even where the signal failed to operate. *(Pennsylvania R. Co. v. Rusynik,* 117 Ohio St. 530, 159 N. E. 826, 828, 56 A. L. R. 538.)

The case at bar, however, is clearly distinguishable from the foregoing decisions. The light signals herein were operating during the time the freight train was passing over the intersection, and decedents had reason to rely upon them, not by virtue of their mere presence, but from the fact that they were obviously in working order. Had these signals not been operating initially the decedents might reasonably have contemplated the possibility of the mechanical failure of the apparatus. Under the circumstances involved herein, it could reasonably be inferred that the decedents were lulled into a sense of security when they saw the signals function-

ing. Hence, when the lights ceased flashing, decedents may have legitimately concluded that it was safe to cross. (*Langston v. Chicago & N. W. Ry. Co., supra.*) This situation was distinguished by the court in the *Whiffin* case, *supra,* where the automatic signals were operating at all times, and the court stated at page 548, ''no failure of the respondent lulled her into a sense of security,'' and emphasized that ordinarily a plaintiff's conduct in going ahead before the adjoining tracks were visible is a question for the jury, unless it can be shown that plaintiff disregarded even a minimum vestige of due care.

The conduct of plaintiffs' decedents herein in proceeding to traverse the crossing when the automatic signals suddenly stopped functioning after the freight train had cleared the intersection, was clearly not of such a nature that all reasonable men would concur in pronouncing them negligent. (*Chicago, B. & Q. R. Co. v. Pollock, supra.*) Nor was contributory negligence the only reasonable inference which could be drawn from the evidence. (*Gills v. New York, C. & St. L. R. Co.,* 342 Ill. 455.) On the contrary, the reasonableness of the decedents' conduct is borne out by the fact that their car traveled practically the same number of feet as did the Carroll's car while the signals were apparently not functioning, and, but for the fact that the Carrolls were two tracks away from the streamliner, instead of just one track as were the decedents, they too might have been killed.

Therefore, in the case at bar, plaintiffs' decedents cannot be deemed contributorily negligent as a matter of law, and inasmuch as there was evidence in the record from which reasonable men could conclude that defendant was negligent in failing to exercise ordinary care to guard against injury to those rightfully passing over its tracks, a court would not be warranted in directing a verdict in favor of defendant. (*Grubb v. Illinois Terminal Co.,* 366 Ill. 330, 338.)

The circuit court, therefore, did not err in denying defendant's motions for a directed verdict and for judgment notwithstanding the verdict. Nor does it appear that the judgment was against the weight of the evidence.

On the basis of the foregoing analysis of the facts and the standards of conduct imposed by courts in railway crossing cases, it is the considered judgment of this court that the judgment of the circuit court should properly be affirmed.

*Judgment affirmed.*