Mabel Murray, Administratrix of Estate of Milton Murray, Deceased, Appellant, v. The Pennsylvania Railroad Company, Appellee.

Gen. No. 45,567.

Opinion filed June 9, 1952. Released for publication June 30, 1952.

ROMAN E. POSANSKI, of Chicago, for appellant; CHARLES D. SNEWIND, of Chicago, of counsel.

THEODORE SCHMIDT, P. J. CRONIN, and HARRY I. PARSONS, all of Chicago, for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Mabel Murray, administratrix of the estate of Milton Murray, deceased, filed a complaint in the superior court of Cook county against the Pennsylvania Railroad Company and Willard Wiltger for the wrongful death of her son Milton, who was 16 years of age. Milton died as a result of injuries suffered when the automobile operated by Wiltger, in which he (Milton) rode as a passenger, was struck by a freight train operated by defendant. The case was tried by the court and a jury. Prior to the trial the cause was dismissed as to Wiltger. Defendant's motion for a directed verdict at the close of plaintiff's case was denied. The only evidence offered by defendant was a photograph of the intersection, whereupon it renewed its motion for a directed verdict. The court allowed the motion and entered judgment accordingly. Plaintiff, appealing, asks that the judgment be reversed and that the cause be remanded with directions for a trial solely on the question of damages, or in the alternative, for a new trial.

The car in which Milton was riding was struck by defendant's freight train at the intersection of its

219

tracks and Henry Street in the Village of Lansing. At that point Henry Street, Lake Street and Greenwood Avenue converge to cross the tracks of the defendant. Greenwood Avenue runs from the southeast to the northwest along the north edge of and parallel to the railroad tracks and terminates at the Henry Street crossing where it converges with Lake Street. Lake Street is an east and west street which also terminates at its intersection with Henry Street and Greenwood Avenue. Ridge Avenue, the main thoroughfare in the village, is an east and west street which parallels Lake Street and is approximately 100 feet south of Lake Street. Henry Street at the point of the occurrence runs north and south. The paved portion of the street is 18 feet wide with a shoulder of stone and gravel. Two lines of railroad tracks cross Henry Street at an angle of about 45 degrees. The tracks run in a southeasterly and northwesterly direction. Traveling south towards the railroad tracks Henry Street passes in front of the Village Hall, which is located on the northeast corner of Lake and Henry Streets, about 35 to 40 feet from the north rail of the tracks. This building obstructs a motorist's view to the southeast down the tracks even in daylight. The view approaching the crossing is further obstructed by the telephone poles along the right of way. In front of the Village Hall there is a small electric light suspended from a telephone post. This light consists only of a bulb which throws a circular spot of light about 15 feet in diameter on the ground. This light is approximately 100 feet north of the tracks and there is no other light at or near the intersection. At the time of the mishap the only warning sign in the vicinity of the crossing indicating the presence of the tracks was an illuminated crossarm sign with the words ''crossing'' on one arm and ''railroad'' on the other. The sign was located about 20 feet north of the north

rail of the tracks and about 15 feet west of the west edge of Henry Street. The lowest ends of the cross-arms of the sign were 8 to 10 feet above the surface of Henry Street and so situated that lights of south-bound automobiles did not show the sign "because it was too high to shine on the cross bucks."

Early in the evening of March 4, 1947, Milton, who was 16 years of age, left his home with Donald Kaizer, another boy about the same age in the latter's auto-mobile for the home of Donald Kuyper which was located about 6 blocks from the Henry Street crossing. At about 11:45 in the evening Kaizer left the Kuyper residence in his car and Milton Murray followed in a car operated and driven by Willard Wiltger. Both cars headed south on Henry Street towards the tracks. Wiltger's car, with Milton as a passenger, followed the car driven by Kaizer by a distance of about a half a block, traveling at a speed of about 35 miles an hour. At the intersection of Henry and Lake Streets Kaizer looked to his left but was able to see down the tracks a distance of only 50 feet. Upon reaching the tracks Kaizer looked again to the southeast but was unable to see the depot 140 feet away. He saw no train approaching the crossing. After he passed over and was 50 feet south of the tracks he heard the noise of an approaching train and for the first time saw the train which was then at the Ridge Road crossing. The windows of his car on the side towards the approach-ing train were down and he was first attracted by the sound of the engine after he crossed the tracks. At this time he saw the headlight of the engine which was dim and threw a light in front of the train for a distance not to exceed 20 to 30 feet. Although he was listening for the sound of a bell or a whistle, he heard none. After crossing the track Kaizer drove to Ridge Ave-nue, turned east and stopped at the Ridge railroad crossing because his engine "went dead." When he

arrived at the crossing the train was blocking the crossing and was moving forward, the engine being "just about to the Henry Street crossing." During all of this time he was listening for the bell and whistle of the train and "didn't hear any. They weren't sounded." The locomotive came to a stop at the Burnham crossing, 35 car lengths past Henry Street.

Harold C. Barkow, who at the time of the accident, operated a restaurant on Ridge Road about 200 feet south of the railroad crossing at Henry Street, testified that he was standing at the window in the front of his restaurant and saw the headlights of a car coming south on Henry Street approaching the tracks. As the car crossed the tracks he noticed the locomotive of the train directly behind him. Although he was in a position to hear a bell and a whistle of the train if one was sounded, and was listening for it, he heard neither. He saw no reflection from the headlights of the engine on the tracks at any time. After the occurrence Wiltger's automobile was lying in a ditch to the north of the tracks and about 20 feet west of the west sidewalk of Henry Street. From 30 to 35 freight cars passed over the point of the mishap before the engine came to a stop. After the occurrence the locomotive of the train was close to a half a mile beyond the intersection and the bumper of the automobile was still hanging on the front of the locomotive. At that time the headlights of the locomotive were dim. Milton died without regaining consciousness in the early morning following the occurrence. His mother, father and brother testified that he was a strong able-bodied boy, industrious, capable and of careful habits.

There was competent evidence from which the jury had the right to find that the defendant, by its servants, was guilty of one or more acts of negligence which were the proximate cause of the injuries resulting in the death of plaintiff's intestate. There

was evidence that the engine approached the crossing without giving the required statutory signals. Witnesses testified that they were in position to hear a bell ring or a whistle blown and that they heard neither. It is well settled that negative evidence is admissible where the attending circumstances show that it has probative value. See *Applegate v. Chicago & Northwestern Ry. Co.*, 334 Ill. App. 141; *Berg v. New York Central Railroad Co.*, 391 Ill. 52; *Chicago & Alton R. Co. v. Dillon*, 123 Ill. 570; and *Peoria, Pekin & Jacksonville R. Co. v. Siltman*, 88 Ill. 529. A railroad is bound to take notice that the public use crossings and that any failure to give customary or statutory signals or neglect to exercise care for their safety would place travelers in great danger, and their failure to give such warning constitutes negligence. *Chapman v. Baltimore & O. Ry. Co.*, 340 Ill. App. 475; and *Randolph v. New York Central Ry. Co.*, 334 Ill. App. 268.

Defendant, to justify the action of the trial court in directing a verdict, asserts that circumstantial evidence that Milton was in the exercise of that degree of care for his own safety which would be normally expected from one of his age, intelligence, experience and capacity, is not admissible where there is an eyewitness to the occurrence who was in a position to see the conduct of the deceased before and at the time of the accident, citing *Petro v. Hines*, 299 Ill. 236; *Goodman v. Chicago & E. I. Ry. Co.*, 248 Ill. App. 128; *Anderson v. Chicago, R. I. & P. Ry. Co.*, 243 Ill. App. 337; *Ingle v. Maloney*, 234 Ill. App. 151; and *Chicago, R. I. & P. Ry. Co. v. Clark*, 108 Ill. 113. Defendant states that there was no evidence to prove that plaintiff's intestate was in the exercise of due care for his own safety except evidence that he was a person of careful and prudent habits; that evidence as to his habits is not admissible where there is direct evidence

consisting of an eyewitness; that Wiltger, the driver of the automobile in which deceased was a passenger, "was therefore an eyewitness to the accident and could testify to all the circumstances surrounding the accident and the events which led up to it"; that "he alone knew what the deceased did at the time of this accident, and his testimony would prove whether deceased was in the exercise of that degree of care necessary in order for his estate to recover anything in the way of damages."

Mabel Murray, mother of the deceased, testified that she saw Milton drive; that he would take her to the store; that she observed that he was a "very careful driver"; that he was "very careful in every way"; that she wasn't "afraid to ride with him at all"; and that "he would look in each direction." John Murray, the father, said that Milton was a "very careful" driver; that he "was always looking for corners and everything before he got there"; and that he would "look out for this and that" and "make sure nothing happened." Witness did not know how long Milton had been driving. He stated that Milton "just got his license then." Peter Murray, a brother of deceased, testified that Milton was "a careful boy"; that when "we approached a crossroad he would stop. If there was anything coming he would say, 'there's one coming pretty fast, better take it easy,' or stop, or 'wait for this one.' "

Willard Wiltger did not testify at the trial. There was no offer of proof as to what his testimony would be. The evidence as to the careful habits of Milton was introduced without objection and there was no motion to strike that testimony. Therefore, at the time the court directed a verdict for the defendant the only evidence as to the due care on the part of Milton was the testimony as to his careful habits and the circumstances related by Donald Kaizer, the driver of

the preceding car. We are of the opinion that defendant is not in a position to voice any objection because of the failure to call Wiltger, or to show that he was available as a witness. In *Chicago & Alton Ry. Co. v. Wilson*, 225 Ill. 50, an action by the administrator for the wrongful death of his wife, it was claimed by defendant that the evidence of its engineer in charge of the train was that he saw the accident and that therefore the evidence introduced on behalf of the plaintiff as to the careful habits of the deceased became incompetent. Our Supreme Court said (53):

"At the time plaintiff's evidence was offered the engineer had not testified. If it was insisted that his evidence rendered that of plaintiff incompetent, counsel for defendant should have moved to exclude plaintiff's testimony, but this was not done."

In *Walters v. Ind*, 319 Ill. App. 162, plaintiff introduced evidence of the careful habits of decedent to which the defendant made no objection. Subsequently, one of the defendants, Raymond Hart, was called as a witness in his own behalf and testified as to the occurrence. The defendant maintained that the evidence of careful habits was incompetent because Hart was an eyewitness and testified at the trial. The court said (167):

"It is claimed that the testimony of Harry Walters and the other witnesses relative to the careful habits of the deceased only raised a presumption of due care and careful habits on the part of the deceased, and that when the witness, Hart, testified as an eyewitness as to how the accident occurred, that then, there was no competent evidence in the record in regard to the due care and caution on the part of the deceased. We do not agree with this contention, as we think this was proper evidence to be submitted to the jury for their consideration. However, the appellants are in no position to raise this question, as there was no motion

made to strike this testimony, and it went to the jury without objection. It was proper evidence at the time it was admitted, and remained such until its competency was questioned by a motion to strike, or in some other legal method.''

The cases cited by defendant are not applicable to the factual situation presented.

■ There was competent evidence to take the case to the jury. The court erred in directing a verdict. Therefore, the judgment of the circuit court of Cook county is reversed and the cause is remanded for a new trial.

*Judgment reversed and cause remanded.*

FRIEND, J. and NIEMEYER, J., concur.