Amalia Niemi, Administratrix of the Estate of August Niemi, Appellee, v. A. A. Sprague and Britton I. Budd, Appellants.

Gen. No. 9,183.

Opinion filed May 18, 1937.

GARDNER, FOOTE, MORROW & MERRICK, of Chicago, for appellants; WALTER M. FOWLER, of Chicago, of counsel.

DECKER & DECKER, of Waukegan, and BOWE & BOWE, of Chicago, for appellee; BERNARD M. DECKER and AUGUSTINE J. BOWE, of counsel.

MR. JUSTICE DOVE delivered the opinion of the court.

Appellee, as administratrix of the estate of her deceased husband, brought this action to recover damages for his alleged wrongful death. The issues made by the complaint and answer have been submitted to two juries. Upon the first trial the jury returned a verdict of not guilty, which was, on motion of the plaintiff, set aside and a new trial awarded. From this order an appeal was prosecuted to this court, where the order of the trial court was affirmed. *Niemi v. Sprague,* 280 Ill. 631 (Abst.). The second trial resulted in a verdict and judgment in favor of the plaintiff for $4,250 and the record is again before us for review.

The complaint alleged that on January 29, 1934, August Niemi, appellee's intestate, while in the exercise of due care and caution for his own safety, was driving an automobile in a westerly direction along Tenth street in the city of Waukegan; that about 9 o'clock in the morning of said day, appellants, by their servants and employees, negligently drove a passenger train over and upon the Tenth street crossing so that it ran into the automobile which Niemi was driving and as a result thereof Niemi died. The negligence alleged was the high rate of speed at which the passenger train was being driven, the failure of the servants of appellants to sound a bell or blow a whistle, the failure of the wigwag signal and bell to operate and the failure of the company to properly guard and protect the crossing except for this wigwag signal and bell which was located at the southwest corner of the crossing. The complaint further alleged that because of the location of the wigwag signal, it did not provide a rea-

sonably safe means of warning those who approached the crossing from the east and that while this signal and bell were intended to warn travelers on the highway of the approach of trains, it failed to function upon this particular occasion and by reason thereof Niemi was impliedly invited to cross said tracks with safety. It was further averred that Niemi did attempt to drive across said crossing, but was killed as a result of the negligence complained of. The answer of the defendants denied the material allegations of the complaint and the issues were submitted to a jury, resulting in the judgment as stated.

No complaint is made by counsel for appellants upon the rulings of the court upon the evidence, nor are any errors assigned with reference to the instructions given at the close of all the evidence, nor is it insisted that the damages are excessive. Counsel do contend, however, that the evidence was insufficient, both upon the question of negligence and upon the question of due care to warrant the trial court in submitting the case to the jury and further, that if the evidence was sufficient to go to the jury, the verdict of the jury is manifestly against the weight of the evidence.

The evidence discloses that appellee's intestate was killed on the morning of January 29, 1934, about 9 o'clock, while he was riding in an automobile along Tenth street in the city of Waukegan. At the place of the accident, Tenth street runs east and west and appellants' tracks run north and south. The train which caused the death of appellee's intestate was a regular northbound electric passenger train which passed the crossing about the same time each morning. Decedent was approaching the crossing from the east in an automobile traveling west on Tenth street. He had lived with his family for six or seven years in the immediate neighborhood of the crossing and was in the

habit of crossing these tracks at this place several times each day. On the morning of the accident, the deceased, as was his custom, had taken his two daughters to school and had crossed the tracks at this Tenth street crossing and after leaving his daughters at the schoolhouse, he was returning to his home when the accident occurred. January 29, 1934, was a bright, cold morning, the temperature ranging somewhere between five and twelve degrees below zero. At the time of the accident the train was traveling at least 55 miles per hour. The automobile, according to some of the testimony, was approaching the crossing slowly; other witnesses expressed the opinion that it was being driven between 40 and 55 miles per hour as it came to the point of collision. Waukegan is a city of approximately 35,000 inhabitants and Tenth street is one of the main traveled streets of the city. Other than the usual stationary railroad crossing signal, appellants had provided at the southwest corner of this crossing a wigwag signal, which consisted of a circular banner supported by a shaft running to a crossbar which is attached to an upright post approximately 14 feet high. The banner itself is located approximately 12 feet from the ground. In the center of the banner there is a light and a bell mechanism is located near the top of the upright post. The signal is electrically operated and normal operation of this wigwag signal consists of a simultaneous swinging back and forth of the large circular banner which moved from side to side like a pendulum with the flashing of the light. Normally it made 35 to 40 cycles a minute and while the pendulum was so moving, the red light flashed and the bell attached to the standard rang. This wigwag signal was an automatically operated electric device, normally put in operation by northbound trains at a cut-in located 2659 feet south of the Tenth street crossing

and by southbound trains at a cut-in located about the same distance north of the crossing. This signal was designed to operate when a train was approaching from either direction and it continued to operate until the last pair of wheels crossed the cut-out beyond the crossing and did not operate when trains were not approaching the crossing.

Joseph Terlap testified that he was riding in a truck and coming toward this crossing from the west on the morning of the accident; that when about 200 feet from the crossing he observed the automobile in which the deceased was riding as it approached the crossing from the east; that it was at that time about 150 feet east of the tracks and his automobile was going slow. This witness further testified that he was familiar with this crossing; that nothing obstructed his view or interfered with his hearing this particular morning; that he saw the collision, observed the wigwag, knows it was not working and he heard no sound and saw no light flashing; that right after the collision, a minute or so, according to this witness, another train, this one coming from the north, crossed this crossing and at that time the truck in which witness was riding was almost beneath the wigwag signal; that he observed it and the signal did not move or operate in any way.

Paul Trater testified that he was driving the truck in which he and Terlap were riding. He also testified that the car which the deceased was driving approached the tracks slowly while the train was going fast; that he didn't observe the wigwag as the train which struck the car of appellee's intestate approached the crossing, but did thereafter, and corroborates Terlap to the effect that when the southbound train passed the crossing a minute or so after the collision, the wigwag did not operate.

Oscar Wilhonen testified that he was a carpenter living in the vicinity of the Tenth street crossing and

was standing on a platform on the west side of the tracks about 7 o'clock on the morning of the accident; that he observed the wigwag signal while both a northbound and a southbound train were passing and on both occasions the signal did not operate.

Lawrence Pindley, a signal maintenance employee of appellants, testified that he was on one of appellants' trains going to Racine, Wisconsin, on the morning of the accident and the train upon which he was riding passed over this crossing about 8 o'clock that morning; that while the signal was operating, it was not working normally, and by that he said he meant it was not working as fast as it did in good weather.

Bernard Knipple testified that he was an employee of appellants in charge of maintaining and inspecting wigwag and block signals and automatic gates in the territory south of the Wisconsin-Illinois State line, and that he tested this particular signal at the Tenth street crossing at about 9:45 a. m. on the morning of the collision, which was about 45 minutes after appellee's intestate was killed; that he energized the circuit with the result that the banner worked, the bell rang and the light lighted. This witness further testified that at 10:15 a. m. on the same day of the collision he again tested the signal, counted the cycles and found that the number of cycles per minute was 15, whereas the normal number of cycles was 35 to 40 cycles per minute. He further testified that cold weather under frosty conditions affected the wigwag and that when he wiped the frost off of the commutator brushes, the signal operated faster.

Caroline Ewry testified on behalf of appellants to the effect that she was a passenger upon the train with which the car of appellee's intestate collided; that she was riding about the center of the first coach on the east side and sitting next to the window; that as the train approached the Tenth street crossing, she ob-

served the automobile and estimated the distance from where the train was at that time to the point of the collision as about 250 feet, while at the same time she estimated that the automobile was about 150 feet east of the track. She further testified that the automobile and train were both going about the same rate of speed and estimated each at 55 miles per hour. She further testified that the whistle on the train was blowing as it approached the crossing and that she watched the deceased, observed the expression on his face, noticed that he had his hands on the steering wheel of his car and was looking ahead and she did not notice him change the position of his head or hands at any time.

The motorman, Charles A. Driscoll, testified that he began blowing the whistle when the train was about 1,500 feet back of the crossing and blew it continuously until the time of the accident; that he first saw the automobile in which appellee's intestate was driving when it was about 40 feet from the rail and he observed that at that time Niemi had his hands on the steering wheel, his body leaning a little forward, that his train and the automobile were going about the same speed and the automobile came in contact with the train about four feet from the extreme front end of the car and directly under where the motorman was sitting.

The evidence is further that there are two tracks at this crossing and regular hourly passenger train service was being maintained and had been maintained for many years across this crossing in both directions from 6 or 7 o'clock in the morning until 11 o'clock each evening. The street along which appellee's intestate was traveling was paved east of the tracks up to within 48 feet of the east rail, but was not paved west of the tracks and there was a slight grade beginning about where the paved portion left off up to the tracks. There is evidence to the effect that there was no heater

in the car which Niemi was driving, that the windows of the car were closed as he drove his children to school and after he let them out, that there was a rectangular piece of cellophane taped to the windshield which prevented it from frosting and through which the driver could readily see, but that a portion of the windshield and windows were frosted. It also appeared from the evidence that Niemi, at the time he was killed, enjoyed good health, was 49 years of age, did not wear glasses and his eyesight and hearing were normal. A series of photographs and a plat were also offered and admitted in evidence and from these, together with all the other evidence in the record, the jury was in a position to determine just what the conditions were on the morning of the accident.

The foregoing is a fair resume of all the evidence in this record and from it counsel for appellants insists that. it is apparent that appellee's intestate relied solely upon the assumption that no train was coming simply because the wigwag signal was not working and counsel argue that the failure of the wigwag signal to operate was no evidence of negligence on the part of appellants nor did such failure constitute an invitation on their part for appellee's intestate to cross the tracks and that as a matter of law, the deceased must be held guilty of contributory negligence which would bar a recovery in this case. In this connection counsel cite several cases from other jurisdictions and call our attention to *Price v. Chicago & E. I. Ry Co.,* 270 Ill. App. 111; *Urban v. Pere Marquette R. Co.,* 266 Ill. App. 152; *Wolczek v. Public Service Co.,* 342 Ill. 482; *Provenzano v. Illinois Cent. R. Co.,* 357 Ill. 192.

*Price v. Chicago & E. I. Ry Co., supra,* was an action to recover for the wrongful death of the son of the driver of an automobile, who was killed as the result of a collision with defendants' train at its ridge road

crossing in the village of Thornton. It appeared from the evidence that the deceased said to his father when the front of the car was 20 or 40 feet west of the track: "Step on it Pop, here comes a train" and that when he was 30 feet from the track, the deceased said to his father: "All right, Pop." It further appeared that the accident happened on a bright, clear day; that there was an unobstructed view of the tracks for a considerable distance; that the automobile in which the plaintiff's intestate was riding was proceeding at a slow rate of speed; and that the evidence tended to prove that the signal light at the crossing was not operating. The Appellate Court particularly on the question of contributory negligence reversed the judgment for the plaintiff and remanded the cause for a new trial and in the course of its opinion said: "If the Packard car was proceeding at the rate of three or four miles an hour, it could have been stopped within a distance of a few feet. . . . A railroad crossing is a dangerous place and one about to cross over such a place is bound to use care commensurate with the known danger. The fact that the lights were not flashing, if they were not, will not relieve one of the duty of using this care, particularly where there is an ample opportunity to get a clear and unobstructed view of the approaching danger. (Citing cases.) One who has an unobstructed view of an approaching train owes a duty to himself to exercise care for his own safety and cannot rely upon the assumption that there will not be a violation of a statutory requirement such as operating signals or ringing bells. Where a passenger riding in an automobile has an opportunity of learning of approaching danger and has the opportunity to avoid it, he should for his own safety exercise due care and warn the driver of such danger. He cannot rely en-

tirely upon the judgment of the driver of the car in which he is riding.''

*Urban v. Pere Marquette R. Co., supra,* was an action to recover for the death of a pedestrian killed by a train. The evidence disclosed that the deceased was of good health, had good hearing and eyesight, had an unobstructed view of the approaching train for several blocks, that the headlight of the train was burning brightly, that the bell and whistle were sounded, that the crossing was clear of traffic, that there was no other train or trains approaching from the same or different directions and that there was nothing to divert the attention of or confuse the deceased. In its opinion the court, after enumerating these factors, said that the only circumstance which might be suggested as excusing the deceased's presence on the track at the time he was hit was the testimony of a single witness, whose testimony was highly improbable and against the preponderance of all the evidence, who had testified that the traffic gate was up. The court therefore held as a matter of law that the deceased was guilty of contributory negligence, which precluded a recovery. We have examined some of the other cases cited and relied upon by appellants, but in none of the other Illinois cases was the court called upon to consider the effect of the failure of an automatic crossing signal to function upon the question of contributory negligence.

It has frequently been held that the mere failure of a person to look and listen as he approaches railroad tracks upon a crossing is not in itself negligence as a matter of law. *Elgin J. & E. Ry Co. v. Lawlor,* 229 Ill. 621; *Chicago Junction R. Co. v. McAnrow,* 114 Ill. App. 501. Whether the deceased in the instant case failed to look for this approaching train and if he did

whether that omission was negligence and directly contributed to his death were questions of fact for the jury to determine. *Chicago & Alton R. Co. v. Robinson,* 106 Ill. 142. "Undoubtedly a failure to look or listen, especially where it affirmatively appears that looking or listening might have enabled the party exposed to injury to see the train and thus avoid being injured, is evidence tending to show negligence. But they are not conclusive evidence, so that a charge of negligence can be predicated upon them as a matter of law. There may be various modifying circumstances excusing the party from looking or listening, and that being the case, a mere failure to look or listen cannot, as a legal conclusion, be pronounced negligence *per se.*" *Chicago & N. W. Ry. Co. v. Dunleavy,* 129 Ill. 132, 148. In *Terre Haute & I. R. Co. v. Voelker,* 129 Ill. 540, at pages 552, 553, the court says: "It has frequently been said in judicial decisions in this State and elsewhere, that it is the duty of persons approaching a railway crossing, to look and listen before going upon the track, and that their failure to do so is negligence, but it will be found generally, though not uniformly, on examining the cases where such language occurs, that it has been used in discussing the duty as to care and caution in approaching a railway crossing, viewed as a mere question of fact, and not as a question of law. It is doubtless a rule of law that a person approaching a railway crossing is bound, in so doing, to exercise such care, caution and circumspection to foresee danger and avoid injury as ordinary prudence would require, having in view all the known dangers of the situation, but precisely what such requirements would be, must manifestly differ with the ever varying circumstances under which such approach may be made. Ordinarily of course the diligent use of the senses of sight and hearing is the most obvious and

practicable means of avoiding injury in such cases, but occasions may and often do arise where the use of those senses would be unavailing, or where their non-use may be excused. The view may be obstructed by intervening objects or by the darkness of the night. Other and louder noises, as is often the case in a city, may confuse the sense of hearing and render its use impracticable. The railway company, by its flagman or other agent or agency, may put the person off his guard and induce him to cross the track without resorting to the usual precautions. The duty may be more or less varied by the age, degree of intelligence and mental capacity of the party, and by a variety of other circumstances by which he may be surrounded. It follows that no invariable rule can be predicated upon the mere act of failing to look or listen, but a jury, properly instructed as to the legal duty in respect to care and caution, of a person approaching a railway crossing, must draw from such act, in connection with all the attendant circumstances, the proper conclusion as to whether he is guilty of negligence or not.''

As we stated in our former opinion, whether the deceased was misled into attempting to drive across the tracks of appellants because of the failure of the wigwag signal to work was not susceptible of direct and positive proof. It would not have been an unreasonable inference, however, to be drawn from all the evidence and facts and circumstances in evidence that deceased would have been warranted in assuming that if the wigwag signal was not operating no train was approaching. We approve much of the language used by the court in *Pennsylvania R. Co. v. Shindledecker*, 44 F. (2d) 162. In that case it appeared that the plaintiff was a truck driver and was injured at a crossing where there was an automatic bell which the jury

found was not ringing upon the occasion in question. In the course of its opinion, the court said: ''We place the affirmance of the submission solely upon the effect of the silent crossing bell in lessening plaintiff's otherwise unescapable obligation to have discovered in time the approaching train, and in therefore so far mitigating his undoubted lack of possible care as to make it a question of fact rather than of law whether his conduct was reasonably prudent. *Wabash Ry v. Glass* (C. C. A. 6) 32 F. (2d) 697, 699. We have many times considered this question, the last in *Leuthold v. Pa. R. R.*, 33 F. (2d) 758. The general rule there stated is not questioned by appellant's counsel; they distinguish that case from this only because they say that here plaintiff's reliance upon the silent bell, as in the nature of an invitation to cross, did not sufficiently appear. True, plaintiff as a witness did not, in so many words, state that reliance, but it did appear that he had driven across at this point daily for many months; that he was thoroughly familiar with this warning bell and was accustomed to hear it above the noise of his engine, so that it was not necessary for him to stop his engine to get the benefit of this protection; and that, at this particular moment, the bell was not ringing and he knew it. Under such conditions, it seems to us there is a reasonable inference, open for adoption for the jury, that plaintiff did rely, in substantial measure, upon the lack of warning from this bell. There would naturally be an established habit of listening for the bell, though perhaps subconsciously, and of relying upon its silence to induce going ahead. If a driver at a particular crossing has been repeatedly stopped or warned by an automatic bell, or flashing light, or swinging signal, or other means familiar to him by which a coming train gives notice of its close approach, and if, on a particular occasion, he is paying sufficient at-

tention to realize that this customary notice is not being given, it is, we think, an entirely permissible inference, even in the lack of any direct proof, that the absence of the usual warning has a substantial effect in leading him to go ahead, and in neutralizing that incessant watchfulness which self-protection would otherwise demand.''

Of course it was the duty of appellee's intestate to have used every reasonable precaution, such as an ordinarily prudent man under the same circumstances would have employed before crossing the appellants' tracks, irrespective of whether the signal was operating or not. The question is what would an ordinarily prudent person have done under all the conditions and circumstances surrounding appellee's intestate, including the fact that the wigwag indicated that no train was approaching the crossing. See *Lindekugel v. Spokane, P. & S. R. Co.,* 149 Ore. 634, 99 A. L. R. 721 and annotation following, beginning at page 729. Had he looked to the north he would have seen the approach of the train which killed him. If he had looked in the opposite direction he might have seen indications that a train was coming from the south. Whether the windows of his car were frosted or not and if so, whether he was thereby prevented from seeing down the track in the direction from which the train was coming was a disputed question of fact. As he approached this crossing, we think, under the evidence, the jury were warranted in concluding that he had a right to rely upon this wigwag signal and that its failure to warn him of the approaching train was notice to him that no train was close at hand and from all the facts, conditions and circumstances as shown in this record, we would not be justified in saying that the jury were not warranted in finding a sufficient excuse for his failure to look (if he did not look) in the

direction from which the train came which cost him his life. It must not be lost sight of that the purpose of this signal was not only to warn traffic of the approach of trains, but its nonoperation was to assure the traveler that it was safe to cross.

We have read all of the evidence in this record and from a careful consideration of it are of the opinion that the issues of fact were properly submitted to the jury and that the finding of the jury is not manifestly against the weight of the evidence and that the jury's conclusion should not be disturbed.

There is one error, however, that necessitates either the reversing of the case or the correction of the judgment in this court. The trial court awarded an execution upon the judgment. The appellants are defending as receivers of the Chicago, North Shore and Milwaukee Railroad Company. It is conceded that a judgment against receivers is payable in due course of administration and that it was error to award execution upon this judgment. Under the Civil Practice Act, however, there is no necessity to remand this case with directions to the lower court to correct the judgment. The judgment will be modified in this court by striking out the portion thereof which awards an execution and in lieu thereof directing that the same be paid by appellants in due course of administration. As so modified, the judgment will be affirmed. The costs in this court to be paid by appellant.

*Judgment modified and as modified affirmed.*