DAVE VAN PATTEN, appellee, v. CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY and MAX RUBLE, appellant.

No. 49843.

(Reported in 102 N.W.2d 898)

MAY 3, 1960.

REHEARING DENIED AUGUST 2, 1960.

W. R. Fimmen, of Bloomfield, and A. B. Howland and B. A. Webster, Jr., both of Des Moines, for appellant.

D. W. Harris, of Bloomfield, and David S. Baker, of Des Moines, for appellee.

GARRETT, J.—On the afternoon of November 30, 1952, the Diesel tractor and tandem trailer of plaintiff came into collision with a locomotive engine of the defendant railroad company at a point where the road of said company crosses Iowa Primary Highway No. 2 near Farmington.

The tractor was being driven by Harold Haynes. Max Ruble, a defendant, was the engineer operating the locomotive. Plaintiff brought suit for the damage done to his tractor and trailer, hereinafter referred to as the truck, and the railroad company counterclaimed for damage to its engine and track. Trial resulted in a verdict for plaintiff for $4560. No verdict was rendered against Ruble. The railroad company filed motions for judgment notwithstanding the verdict and for a new trial which were overrruled and it has appealed.

As plaintiff's truck approached the crossing it was preceded by a 1952 Oldsmobile automobile driven by Arley Wheaton. In the front seat with Wheaton were his wife and her brother, Harold Hamburg.

The occupants of the car and truck testified they did not hear the train whistle or bell although the car and truck windows were open. The truck was following the car at a distance of around 100 to 150 feet and had done so for approximately half a mile. The tractor had air brakes and was in good mechanical condition and the tractor-truck combination had fourteen almost new tires. When the brake lights on the Wheaton car suddenly came on Haynes applied the truck brakes. According to Wheaton's testimony his car stopped on the concrete pavement some thirty feet east of the track. The truck, failing to stop, struck the Oldsmobile with such force that the front seat broke off and the occupants were precipitated into the back seat while the car proceeded across the track in front of the train and seven hundred feet up the hill. The truck continued on its way and struck the locomotive near the front forcing the engine off the

track. From the photographic exhibits, it appears the truck ran into the side of the locomotive. The truck came to a stop on the east side of the track.

The railroad with Federal Government aid had installed an automatic warning signal device consisting of red lights, a bell and an octagonal metal disc with the word "stop" on it. The defendant, in court, conceded these signals were not functioning at the time of the collision except that the stop sign or disc faced squarely the oncoming traffic. This signaling device was so constructed that when the lights and bell were operating to warn of an approaching train the disc was parallel with the highway and not visible to highway traffic as a stop sign but when the bell-and-light system was out of order the "stop" sign automatically turned to a position at right angles to the highway and so remained as a warning to those using the highway.

Mr. Wheaton testified, "I saw a stop sign telling me to stop as I approached there that day. * * * We approached the crossing at about 45 or 50 miles an hour. We were driving about the same speed all along, after we got up speed out on the highway until we started stopping at the crossing * * * when Mr. Hamburg said 'hold it'." Wheaton also said "I didn't observe any gravel on the surface of the pavement that I saw or feel any."

Mrs. Wheaton testified, "I couldn't say whether or not our car skidded as it came to a stop but Mr. Wheaton didn't appear to have any difficulty in stopping the car. There wasn't any gravel on the highway as we came up there." Haynes said there was gravel on the pavement which caused the truck to skid and hindered his bringing it to a stop after the car signals warned him of danger.

I. It is appellee's contention appellant was negligent in failing to sound the engine whistle and bell and in failing to have its crossing signaling device in operation; that such negligence was the proximate cause of the damage he sustained and that his truck operator was free from negligence.

In argument appellant states: "The appellant concedes here, as in the trial court, that there was a question for the jury as to whether or not the defendant was negligent in having

its crossing signals in a nonoperating condition and whether it knew or should have known that they were in such condition and further as to whether or not its servant Max Ruble was negligent in failing to sound the whistle or ring the bell on the engine." Having made this concession, and the jury having found against it, appellant cannot complain that the jury found it was negligent, unless, as it claims, the jury proceeded under instructions which were erroneous and prejudicial.

Appellant in argument further said: "The fact that these questions were for the jury does not mean however that the appellant concedes that jury questions existed on all phases of the case or that the plaintiff sustained his burden of showing himself free from contributory negligence. This is particularly true since the jury returned its verdict in favor of the defendant Max Ruble and thus necessarily removes certain issues from the case. The fact that the jury returned its verdict in favor of the defendant Max Ruble necessarily means either one of two things. Either the jury found that the whistle and bell were sounded on the engine by the defendant Max Ruble and that he was therefore not negligent, or the jury found that if the whistle and bell were not sounded that this negligence was not the proximate cause of the collision."

Whether the jury was right in finding for the defendant Ruble we are not called upon to decide since neither he nor plaintiff has appealed. The jury made no express finding that the whistle and bell on the locomotive were or were not sounded. If the failure to sound the whistle and ring the bell was the only negligence upon which a verdict against appellant could have been predicated then a finding for the engineer would have been inconsistent with a finding against the railroad company. In this case, however, another ground of negligence was claimed, this being the failure of the warning signals at the crossing to operate.

The court properly submitted to the jury the question whether or not the negligence, if any, of the engineer was the proximate cause of the collision. We must conclude the jury determined that if there was any negligence on the part of Ruble it was not the proximate cause of the loss of appellee.

Thus, the inference from the verdict is that appellant failed to have its automatic warning lights and bell in complete operation and that this was the proximate cause of the damage sustained.

II. It was admitted the crossing signals were in a non-operating condition at the time of the collision and the day before and on at least one other occasion before that, except that the disc part of the device was operating as intended by the company. The jury could properly find that the appellant had a reasonable opportunity to know of and correct this situation. If it is important to have such safeguards for the protection of life and property it is equally important that they be carefully and properly maintained and kept in operation.

Appellant contends the signaling system was in operation in that when the electric power ceased the disc came into place and remained there to warn users of the highway until the electric power was restored.

Section 321.341 of the 1950 Code provides: "Obedience to signal of train. Whenever any person driving a vehicle approaches a railroad grade crossing and warning is given by automatic signal or crossing gates or a flagman *or otherwise* of the immediate approach of a train, the driver of such vehicle shall stop within fifty feet but not less than ten feet from the nearest track of such railroad and shall not proceed until he can do so safely. * * *."

Appellant states: "The plaintiff was necessarily guilty of contributory negligence as a matter of law in violating Section 321.341 of the Code of Iowa by failing to bring his truck to a stop at a railroad crossing when signal of an approaching train was given, particularly where the evidence was undisputed that the stop sign was in the 'stop' position."

We must determine whether or not Haynes was guilty as a matter of law of contributory negligence in operating his truck as he did under the circumstances then existing. In his argument appellee states: "Appellee does not deny that the question of whether or not the plaintiff's driver was guilty of contributory negligence was a close question." The able trial judge expressed the same view.

The truck approached the crossing with the driver having full knowledge of its location and the hazards which go with railroad crossings. The stop sign was in plain view. At considerable distance he did observe the lights and bell were not operating but maintains he did not see the disc with the word "stop" on it. The stop sign may not have been appropriate when no train was near but it was quite appropriate when a train was practically upon the crossing. Haynes should have seen the sign as did the passengers in the Oldsmobile and should .have been alerted thereby. The statute provides that when "warning is given by automatic signal or crossing gates or a flagman *or otherwise* of the immediate approach of a train" the driver shall stop not less than ten feet from the nearest track. At the time involved a train was approaching the crossing and notice. was given, not by gates or a flagman but "otherwise" of its immediate approach. Red lights, ringing bells or a stop sign in the hands of a flagman warn of an approaching train. Can it be said that a properly located stop sign such as was involved in this case did not give a warning "otherwise" when a train was actually about to come upon the crossing? The question is not without its difficulties.

"The fact that the railroad company equipped the crossing with this warning device shows its recognition that without it the crossing was hazardous; * * *. There is something more: at least for those who knew of the warning bell, failure to keep it in operating order added greatly to the danger at the crossing.

"The point is well stated in Langston v. Chicago & Northwestern Ry. Co., 398 Ill. 248, 254, 75 N.E.2d 363, 366: 'It has likewise been held that when railroad crossing signals are maintained by a company, even though the law does not require them to be installed, the public has a right to rely upon the railroad company to keep the same in an efficient working condition [citing authorities].' On the same page of the opinion the Illinois Supreme Court quoted with approval from Niemi v. Sprague, 288 Ill. App. 372, 386, 8 N.E.2d 707, 713: 'It must not be lost sight of that the purpose of this signal was not only to warn traffic of the approach of trains, but its nonoperation was to assure the traveler that it was safe to cross.' " Russell v.

Chicago, Rock Island & Pacific Railroad Co., 249 Iowa 664, 670, 671, 86 N.W.2d 843, 847.

In the instant case surely the stop sign was not an assurance it was safe to cross. It should put any reasonably prudent person on his guard. When a flagman waves a stop sign it warns traffic to stop. In this case the sign was put in place mechanically upon failure of the electric current but none the less it was a warning to stop. Does one operating a motor vehicle have a right to ignore such sign when there is actually imminent danger and say it means nothing? The state highway commission has placed many similar stop signs upon this primary highway and failure to observe their mandate often subjects the violator to punishment. The presence of the stop sign foreclosed the right of the traveler, observing the automatic signals were not working, to presume he could proceed with safety. The stop sign warned him he could not do so.

In Dusold v. Chicago Great Western Ry. Co., 162 Iowa 441, 450, 142 N.W. 213, 216, this court said: "Care in avoiding danger implies that there is, or would be, with all prudent persons, something to create a sense of danger. If the circumstances are not such as would put a prudent and cautious man upon his guard, the omission to exercise more than ordinary attention is not the negligence contemplated by law as contributing to the accident. * * *

"The question is not when he could see, but when, by the exercise of reasonable care on his part, he could have seen and avoided the danger, and the further question, did he exercise reasonable care and caution for his own safety in what he did, or omitted to do at that particular time?"

The circumstances here were such as would put a cautious and prudent man upon his guard. Haynes should have seen the stop warning when he observed the mechanical signaling device was not operating and should have brought his truck under control as he approached the crossing.

The truck was a large, heavy and powerful vehicle, and a dangerous instrumentality when out of control. One who operates such a vehicle upon the public highways should observe all

traffic control signs and should at all times observe the traffic and the conditions surrounding him.

The law of this case was given in Instruction No. 17. "The plaintiff's employee when approaching the railroad crossing was bound to know that trains might be approaching the crossing, and that it was his duty to yield the right of way to any such train. He had the right to assume such train would sound the whistle and ring the bell as required by law, and he might assume the signaling device was working; but he was required to exercise his faculties of sight and hearing to ascertain whether a train was approaching. He is to be charged with seeing and hearing all that an ordinarily careful and prudent driver would have seen and heard under like circumstances, but he is not charged with seeing and hearing what he could not have seen or heard in the exercise of ordinary care. He must approach the crossing at such speed as would be reasonable and proper under the circumstances. He must exercise the care and caution which an ordinarily prudent and careful man would have exercised under like circumstances. If he failed to do so he would be guilty of negligence, and if such negligence contributed in any way or in any degree directly in producing the collision he would be guilty of contributory negligence and plaintiff cannot recover in this action."

Regarding the truck driver the trial court instructed that he was "charged with seeing and hearing all that an ordinarily careful and prudent driver would have seen and heard under like circumstances. * * * He must approach the crossing at such speed as would be reasonable and proper under the circumstances. * * * If he failed to do so he would be guilty of negligence, * * *."

The evidence must be considered in the light most favorable to the plaintiff and this requires consideration of the testimony and conduct of plaintiff's driver, Harold Haynes.

He testified: "I came along about the same speed up that hill about 35 or 40 miles an hour. I was about 100 or 150 feet from the railroad track when I saw the lights go on on the car in front of me. Maybe more than that, I would'nt say for sure. * * * I would rather say 200 feet. The Wheaton car wasn't

very far from the railroad tracks when the lights went on, I would say within fifty feet. I didn't see him stop. I am sure I hit him before he stopped sliding. * * * I looked up the track to my right, to the north, the direction the train actually came from. I kept looking that way all the way up from the bridge up till the stop lights come on on the car, and then that was all. After I was within about 200 feet, I didn't look any more. I was busy. I glanced at the flashing lights once or twice and kept watching the car ahead of me. That's all I could do. The last time that I looked to the right, I was in the neighborhood of some 200 feet back. At a point 200 feet back, *I think I could see up the railroad track 100 or 150 feet,* and at that point, I didn't see any train coming, but I did look up the track at that point." (Italics supplied.)

E. G. Evans, oil station operator, testified: "Standing upon the highway * * * at a point 200 feet east of the crossing you can see a man down on the track 212 feet to the northwest. At 250 feet east you can see him 159 feet down the track."

If these measurements were not true and correct it is inconceivable they would not have been challenged by other specific measurements. We must however give consideration to the estimates of other witnesses.

Arley Wheaton testified: "As we approached the railroad crossing, I didn't see or hear anything till I got there. Harold Hamburg, my wife's brother, says, 'Hold it.' Just about that time I saw it, just about the same time he said it. I just applied my brakes and stopped. I really don't know how far it was from the track when he said 'hold it.' I know it was about three car lengths from the track. I imagine 30 to 35 feet away from it. It was further back than that when I first saw the train, I imagine when I saw the train it was 150 or 200 feet from the crossing. When I saw the train, it was probably a couple hundred feet up the track and I was about the same angle across there."

On cross-examination he said: "I imagine we were 150 or 180 feet from the crossing when Mr. Hamburg said 'hold it.' * * * A few days after the accident I made a statement and I said that when I was about 75 or 80 feet east of the crossing that I saw the train about 75 or 100 feet up the track."

Harold Hamburg testified: "The first place you could see the train was when you were about seventy feet from it, approximately. At that time, the train was around one hundred and seventy or one hundred and eighty feet away, and that is the first time you could see that train when we were within seventy feet of the track—that would be from the crossing on the track."

The only evidence as to where the car stopped before it was struck by the truck was it was two or three car lengths or 30 to 35 feet from the track.

Haynes further testified: "When the Wheaton car hit the brakes and started stopping, they were 100 or 150 feet ahead of me and there were no cars that I saw coming from the other direction. I didn't know there was a train coming. I didn't make any attempt to turn left to try to avoid the Wheaton car. If I had turned to my left, there would have been somebody coming more than likely. When you watch the truck, watch the lights and watch the car, you don't see anything else. If I was going to hit anything, I would rather hit the car in the back end than hit the car headon. I didn't have time to edge out a bit to see if a car was coming. I didn't have time for anything like that. I didn't see any cars coming. One hundred to 150 feet back, I think I could stop the rig within 75 feet, under normal conditions. And I was still 150 feet back. * * * Relative to thinking about turning out to the left, I really didn't have time for nothing, just try to get stopped, that's all. I didn't have time to think about anything hardly."

The driver of the Oldsmobile, traveling at forty to forty-five miles an hour, nearing the railroad crossing easily brought his car to a stop. He did what any reasonably careful and prudent man would do under the existing circumstances. The same thing cannot be said of Haynes. He said, "One hundred to 150 feet back, I think I could stop the rig within 75 feet under normal conditions." Here was a situation which it was his duty to anticipate and he could not stop within the 150 to 200 feet he admits he had. He knew he was coming upon a railroad track and while he had a right to rely to some extent upon the train whistle and bell and the automatic signaling device he knew such devices often fail and that anyone approaching such track

has a duty to use reasonable care and be able to avoid a collision if a train should come upon the crossing as trains are, at intervals, bound to do.

"* * * so long as a railroad track is maintained across a public highway that, of itself, is notice to the world that trains are likely to be run thereon." Gallagher v. Montpelier & Wells River Railroad, 100 Vt. 299, 303, 137 A. 207, 209, 52 A. L. R. 744, 748.

But one conclusion can be drawn from the admitted conduct of Haynes and that is that he was grossly negligent in not having his truck under control so as to bring it to a stop without injury to others under the conditions and circumstances then existing.

Section 321.285, 1950 Code, provided: "Any person driving a motor vehicle on a highway shall drive the same at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing, and no person shall drive any vehicle upon a highway at a speed greater than will permit him to bring it to a stop within the assured clear distance ahead, such driver having the right to assume, however, that all persons using said highway will observe the law."

Section 321.307, Code of 1950, states: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."

In Strom v. Des Moines & Central Iowa Ry. Co., 248 Iowa 1052, 1062, 82 N.W.2d 781, 787, we said, "Many of our railroad-crossing cases point out in substance that precedents are of little value because the facts control and they differ." (Citing many cases)

In this case there were no diverting circumstances, Haynes' attention being directed wholly to the automobile, highway and railway crossing directly in front of him. He then devoted his whole attention to stopping but could not do so in the admitted

150 to 200 feet available to him. Looking, of course, is of no avail if one cannot stop when he sees the danger.

■ In a unanimous decision of this court, in an opinion written by Justice Faville, in the case of Lutz v. Davis, 195 Iowa 1049, 1052, 192 N.W. 15, 17, we said: "The general rules of law regarding the duty of one about to cross a railway crossing, in order to be free from contributory negligence, are not intricate nor obscure. All courts agree that due care requires that a traveler, under such circumstances, must use his senses of sight and hearing, before attempting to cross a railway track, and in order to be free from contributory negligence, must look and listen for an approaching train. A failure so to do constitutes negligence on his part, as a matter of law. Now, if such plaintiff fails to prove that he did look and listen, then, applying the established rules of law, the court must hold that, as 'a matter of law,' the plaintiff has failed in an essential legal requisite of his proof, and cannot recover."

In Darden v. Chicago & N. W. R. Co., 213 Iowa 583, 586, 239 N.W. 531, 533, we said, "* * * Since she failed to do those things which the law requires of a person approaching a railroad track—which is a known place of danger, where trains may be expected to pass at any time—no recovery can be had. The duty is placed on the driver of an automobile to look and listen for trains, and it was one of plaintiff's duties to look, at the place where, by looking, she could have seen, and by listening, she could have heard the same." (Citing cases)

■ In Pazen v. Des Moines Transportation Co., 223 Iowa 23, 30, 272 N.W. 126, 130, we said, "The term 'proper lookout' means more than to look straight ahead, or more than seeing the object. It implies being watchful of the movements of his own vehicle as well as the movements of the thing seen. It involves the care, prudence, watchfulness and attention of an ordinarily careful and prudent person under the circumstances."

■ III. Appellee claims that gravel on the pavement made it impossible for him to stop the truck in time to avoid the collision. It appears to this court that the evidence in support of this claim is not sufficient to sustain the verdict. In arriving at this conclusion we consider the entire record in the light most

1234

favorable to the plaintiff. Mr. Wheaton testified he observed no gravel on the pavement and Mrs. Wheaton stated there was no gravel thereon. There is no testimony by any witness other than Haynes that there was gravel present on the pavement at the time of the collision, and he did not observe it until the next day. A careful examination of Haynes' testimony discloses statements casting doubt on his claim that there was sufficient gravel to materially affect the movement of the large truck. If there had been an appreciable amount of rock or gravel present that fact would no doubt have been supported by additional evidence in view of the testimony of the Wheatons, to the contrary. Common experience leads to the opinion that it would take a substantial amount of gravel to affect the traction of the truck with its 14 wheels and practically new tires. Haynes testified:

"I didn't get out and look around that night, but after I got out of the hospital, I went back there the next day. I observed skid marks on the pavement. I could see where the wheels had been slid *slightly*. You couldn't tell very plain because there was rocks and gravel on the pavement. It was river-bed gravel, the size of a pea to a marble. *They didn't show up very plain.* * * * When I was trying to stop, the vehicle felt like it was jumping, grip and slide. * * * I didn't know what caused it to slide until the next day. The next day I found that rock and stuff on the highway. * * * *As I approached the crossing on this particular day, I couldn't see this loose gravel down there,* which affected my stopping. * * * I didn't see any gravel on the north side of the highway, on the south side. *On the north side there was, and on the south side there wasn't.* * * * It didn't cover the entire highway. It was just scattered around over the highway. I couldn't see it the day of the accident, *I couldn't see no gravel on the highway that day.* * * * I didn't make any attempt to turn to the left, and I couldn't turn right into the lane."

Two other witnesses testified they saw some gravel on the highway.

We are of the opinion that when this testimony is properly evaluated with its inherent weaknesses along with the rest

of the record there is insufficient creditable evidence to sustain a jury verdict for the plaintiff. Plaintiff has failed to show his freedom from contributory negligence.

IV. In view of what we have held herein we deem it unnecessary to review the instructions.

V. On the record as made neither party seeking affirmative relief is entitled to recover.—Reversed.

LARSON, C. J., and HAYS and PETERSON, JJ., concur.

THORNTON, J., concurs in result.

GARFIELD, J., dissents.

OLIVER and BLISS, JJ., not sitting.

GARFIELD, J. (dissenting)— I. Code section 321.341, headed "Obedience to signal of train", provides: "Whenever any person driving a vehicle approaches a railroad grade crossing and warning is given by automatic signal or crossing gates or a flagman or otherwise *of the immediate approach of a train*, the driver of such vehicle shall stop * * *." (Emphasis added.)

There is no claim gates or a flagman were placed at the crossing. The railroad concedes its automatic signal device, consisting of flashing red lights and bell, was not in working order at the time of the collision. There is undisputed evidence it was not working the day before the collision. There is testimony, however, that a stop sign was facing vehicular traffic. This sign was stationary when the automatic signal device was not in working order. It then faced traffic wholly irrespective of the immediate approach of a train. It gave no other or different warning when a train was immediately approaching than at any other time. In this respect it differed from the automatic signal, crossing gates and flagman—the three methods of warning of a train's approach to which section 321.341 refers.

The majority evidently proceeds on the assumption it conclusively appears this stop sign was facing traffic when the collision occurred. However, the railroad's requested jury instruction 7 left to the jury the question whether the stop sign was "in the stopped position facing oncoming traffic" at the

1236

time of the collision. The railroad is thus in no position to contend, nor should this court hold, it conclusively appears the stop sign was facing motor vehicle traffic at the time in question.

The majority holds as a matter of law that plaintiff's driver violated section 321.341 on the theory this stop sign, which the railroad contends faced motor vehicle traffic continuously when the automatic signal device did not function, was a warning "otherwise of the immediate approach of a train." The majority says: "At the time involved a train was approaching the crossing and notice was given, not by gates or a flagman but 'otherwise' of its immediate approach." This shortly follows the statement in the opinion, "The stop sign may not have been appropriate when no train was near but it was quite appropriate when a train was practically upon the crossing."

Thus, according to the majority, the stop sign was not an appropriate warning of the immediate approach of a train if there were none but if a train was immediately approaching, such a sign was an appropriate warning thereof. I think such a holding is unsound. Under it the warning depends not at all upon its nature but wholly upon the immediate approach of the train. Of course there can be no violation of the statute unless warning is given of the immediate approach of a train.

Under the majority's view a railroad need not place an automatic signal, crossing gates or a flagman at crossings more than ordinarily dangerous even though essential to the reasonable protection of travelers on the highway. All that is needed is a stationary stop sign. It would warn of the immediate approach of a train if there were one, otherwise not. I think the majority's holding is contrary to many decisions of ours to the effect some warning *signal* of a *train's approach,* other than the whistle or bell required by statute, may be required when the crossing is more than ordinarily dangerous. See Strom v. Des Moines & Central Iowa Ry. Co., 248 Iowa 1052, 1068, 1069, 82 N.W.2d 781, 790, 791, and citations; Plumb v. The Minneapolis and St. L. Ry. Co., 249 Iowa 1187, 1196, 1197, 91 N.W.2d 380, 386. See also Russell v. Chicago, R. I. & P. R. Co., 249 Iowa 664, 670, 671, 86 N.W.2d 843, 847, 848, cited by the majority.

If, as the majority holds, the stop sign (locked in place

for at least two days) was a sufficient warning of the immediate approach of a train so that Haynes violated section 321.341 by not stopping the truck, it is unlikely appellant would have opened its printed argument with the concession to which the majority refers: "there was a question for the jury as to whether or not the defendant was negligent in having its crossing signals in a nonoperating condition * * *."

II. The majority gives little if any weight to the conceded fact the flashing red lights and bell on the automatic signal device were not working at the time of the collision. Plaintiff's driver was entitled to assume from this fact that no train was immediately approaching. He testified, "I was relying upon the lights and the car ahead of me. I looked at the track there as far as I could see, and after that started happening in front of me I couldn't do much more looking." Also, "I knew of the flashing light and bell system located at the crossing before the accident. I relied upon it to warn me of the approach of the train." Not only does the majority disregard this testimony but it declares "he [plaintiff's driver] knew such devices often fail." There is nothing in the record to support such a statement.

We have recently held the public has a right to rely upon the railroad to keep automatic signal devices in efficient working order and their " 'nonoperation was to assure the traveler that it was safe to cross.' " Russell v. Chicago, R. I. & P. R. Co., 249 Iowa 664, 671, 86 N.W.2d 843, 847, from which the majority quotes.

Crowley v. Chicago, B. & Q. R. Co., 204 Iowa 1385, 1393, 213 N.W. 403, 407, 53 A. L. R. 964, reversed a judgment for defendant pursuant to directed verdict on the ground of contributory negligence where defendant's automatic signal bell and red light did not indicate approach of a train. We said, "The inactivity of the signaling device indicated that no train was approaching. Almost without exception, the authorities agree that the traveler has a right to rely to some extent on this fact; that it is a circumstance to be taken into account in determining whether he exercised due care."

The annotation in 53 A. L. R. 973, 978 et seq., to the

Crowley opinion cites many precedents in support of the rule just quoted.

In Brose v. Chicago G. W. R. Co., 185 Iowa 867, 870, 171 N.W. 149, 150, quoted from in the Crowley case, an electric signal gong at the crossing did not sound as the train approached. We stated: "Plaintiff knew of the automatic signaling device at the crossing, and was quite naturally induced, by its failure to work, to believe the crossing clear and free from danger. The jury had a right to take this fact into consideration, in deciding whether plaintiff exercised ordinary care in attempting to go upon the crossing. [citations] * * * The question of contributory negligence was clearly for the jury."

See also Lockridge v. Minneapolis & St. L. R. Co., 161 Iowa 74, 140 N.W. 834, Ann. Cas. 1916A 158, where the flagman failed to warn plaintiff of the approach of a train and we held the issue of freedom from contributory negligence was for the jury.

Applegate v. Chicago & N. W. R. Co., 334 Ill. App. 141, 155, 78 N.E.2d 793, 799, cited by defendant, states: "Where, as in the instant case, warning signals have failed at a railway crossing the Illinois courts as well as those in the majority of jurisdictions have held that the nonfunctioning of the signals is a factor to be considered by the jury in determining whether there was contributory negligence, since the purpose of the signal is not only to warn traffic of the approach of trains, but its nonoperation is to assure the traveler that it is safe to cross [citations]."

Mohr v. Toledo, P. & W. R. Co., 7 Cir., 232 F.2d 869, 871, says: "Blinker warning signals which are not working also constitute an invitation to cross a railroad track with an implied assurance of safety from being struck by an approaching train."

The annotation in 99 A. L. R. 729, 733, supplementing the one in 53 A. L. R. 973 to our Crowley case, supra, states: "In the great majority of the recent cases, * * * it has been held that, while the failure of a signaling device at a railroad crossing to operate and warn of the approach of a train does not entirely relieve a traveler from his duty to look and listen for an approaching train, nevertheless the traveler may rely to some extent on the apparent safety implied from the silence of the

signal, and such silence of the signal is a circumstance to be taken into consideration by the jury, along with other factors, on the issue of contributory negligence."

To the same effect is 44 Am. Jur., Railroads, section 563.

75 C. J. S., Railroads, section 878, says: "It is also ordinarily a question for the jury whether the person injured * * * exercised proper care in attempting to cross in reliance on the fact that signaling devices at the crossing were not being operated * * *." Brose v. Chicago G. W. R. Co., supra, 185 Iowa 867, 171 N.W. 149, and numerous other precedents are cited in support.

Neither the railroad nor the majority cites any authority for a holding that on evidence comparable to this a traveler is contributorily negligent as a matter of law. Indeed the only precedent cited by the majority which holds the driver was so negligent is Darden v. Chicago & N. W. R. Co., 213 Iowa 583, 239 N.W. 531, where the facts are entirely different. In Dusold v. Chicago Great Western Ry. Co., 162 Iowa 441, 449, 142 N.W. 213, 216, cited and quoted from by the majority, the issue of freedom from contributory negligence was held to be for the jury. Also in Strom v. Des Moines & Central Iowa Ry. Co., 248 Iowa 1052, 82 N.W.2d 781, and Lutz v. Davis, 195 Iowa 1049, 192 N.W. 15. The Dusold opinion states:

"It is true that a person approaching a railway crossing must be vigilant to discover the approach of trains and use reasonable care to avoid injury therefrom, but whether he has done so in a particular case is nearly always a question for the jury, and it depends on so many facts and circumstances and conditions that it is sometimes very difficult to say whether or not a party did, at a particular time, exercise that care. * * *. While a railroad crossing suggests danger, the absence of danger signals, the absence of that which usually and ordinarily exists, which suggests danger, may have the effect of lulling the mind into a sense of security. * * *.

"It is true that the absence of statutory signals does not relieve a party, attempting to cross a railway track, from the duty of vigilantly using all his senses to ascertain if there is danger in crossing, but this fact is proper to be considered by

the jury, with all the other facts, in determining whether or not he exercised reasonable care and caution for his own safety."

III. The majority in effect discards testimony for plaintiff of the presence of gravel upon the roadway as the crossing was approached. Appellant's requested jury instruction 6 conceded there was sufficient evidence that gravel was present on the highway near the crossing and left it to the jury to determine whether "there was sufficient gravel upon the surface of the highway to make it impossible to stop the truck before striking the Wheaton automobile and coming into collision with defendant's train."

The trial court embodied the substance of this sixth request in instruction 18 which recites there was evidence of gravel on the highway east of the railroad track which should be considered in determining whether plaintiff (driver) was guilty of contributory negligence. Appellant took no exception to instruction 18. It says in argument, "This claim [gravel] is barely supported by the Record and only by plaintiff himself and the driver." Appellant is not in position to contend (and does not do so), nor should the majority hold, there is no evidence of gravel on the surface of the highway near the crossing which might properly be considered on the issue of freedom of plaintiff's driver from contributory negligence.

In any event the majority's discarding the testimony for plaintiff that there was gravel on the north side of the highway is a clear invasion of the province of the jury. Haynes testified in part:

"Relative to the pieces of gravel on the highway, they would run * * * from the size of a pea up to the size of a marble, something like that. It was all along the highway on the pavement and down along the edge of the pavement, just on one side. It was up to the railroad track and down to, oh, I expect, 100 feet from the railroad track, down to that first sign down there, about in there. * * * The gravel extended as much as 100, maybe 150 feet east of the track."

Plaintiff himself arrived at the scene of collision only two hours after it occurred. He said, "I observed gravel there on the pavement. I would say it extended about 100 feet east of

the crossing on the pavement. Gravel is what we would call pea gravel, about the size of a pea * * *. It was river-bed gravel, not crushed limestone." Plaintiff was not cross-examined on this testimony.

Frank Van Patten gave similar evidence. He said: "I observed the pavement in the vicinity immediately east of the crossing that night. There was gravel on the pavement. The reason I noticed it was * * * the wheels started spinning on the wrecker. * * * It was river gravel on the pavement. It runs from small to the size of marbles."

It appears without dispute a side road led from the pavement near the railroad crossing to a sand and gravel pit near by.

The majority rejects the testimony of those three witnesses for plaintiff because defendant's witness Wheaton testified, almost six years after the collision, he did not observe any gravel on the pavement, and Mrs. Wheaton said there was not any "as we came up there." Mrs. Wheaton also testified, "I noticed the crossing signals at the crossing and didn't notice whether or not they were working. * * * I don't remember seeing the stop sign facing us * * *."

Plaintiff's driver gave this testimony which the majority ignores:

"The next day I found rock and gravel on the highway. You could see that is what caused it to slide, not get traction. * * * Driving 35 or 40 miles an hour on a paved highway, not loaded, assuming there was no gravel on the highway, that the pavement was dry and smooth, I could stop that vehicle in 75 or 100 feet, something like that.

"Q. Why didn't you stop before you struck the Wheaton car? A. I would have if that gravel and stuff hadn't been on the pavement."

IV. The majority gives no consideration to the obstructions to view as the crossing was approached from the east. Haynes testified, "On the day of the accident there was lots of brush, trees and weeds and there is a high bank setting up alongside the railroad track there. There were a lot of young jack oaks along there. * * * They affected my view to the north.

I just couldn't see a train coming if there was one." There is other evidence of obstructions to view.

Kinney v. Larsen, 239 Iowa 494, 500, 31 N.W.2d 635, 638, cited by defendant, says of cases in which there was substantial evidence the view of the railroad track was obstructed " 'so as to render it impossible or difficult to learn of the approach of a train' " or evidence of diverting circumstances which would tend to throw a person off his guard: "In general we have held that where the view of the crossing is so obstructed or there are such diverting circumstances the question of contributory negligence is for the jury."

The same statement appears in Strom v. Des Moines and Central Iowa Ry. Co., supra, 248 Iowa 1052, 1063, 82 N.W.2d 781, 787, cited by the majority.

I would affirm.

THOMPSON, J., joins in this dissent.